**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4789**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

JOVON LOVELLE MEDLEY,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.
Paul W. Grimm, United States District Judge. (8:17–cr–00242–PWG–1)

Argued: January 29, 2020                                    Decided: August 21, 2020

Before GREGORY, Chief Judge, KING, and QUATTLEBAUM, Circuit Judges.

Vacated and remanded with instructions by published opinion. Chief Judge Gregory wrote
the opinion, in which Judge King joined. Judge Quattlebaum wrote a dissenting opinion.

**ARGUED:** Cullen Oakes Macbeth, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Greenbelt, Maryland, for Appellant. Burden Hastings Walker, OFFICE OF THE UNITED
STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda,
Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore,
Maryland, for Appellant. Robert K. Hur, United States Attorney, Baltimore, Maryland,
Christian J. Nauvel, Special Assistant United States Attorney, Thomas M. Sullivan,
Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Greenbelt, Maryland, for Appellee.

GREGORY, Chief Judge:

Jovon Medley was tried on three charges: possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); carjacking resulting in serious bodily injury, in violation of 18 U.S.C. § 2119(2); and using, carrying, brandishing, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). After a five-day trial, a jury found Medley guilty of the § 922(g) charge but acquitted him of the other two charges related to the carjacking. At sentencing, the district court judge found, by a preponderance of the evidence, that Medley used this firearm in connection with the carjacking. Consequently, Medley received a four-level enhancement under the Sentencing Guidelines and was sentenced to 78 months of imprisonment, followed by three years of supervised release.

In his initial brief to this Court, Medley raised various Fifth and Sixth Amendment challenges to his conviction and sentence. Then, after the Supreme Court issued *Rehaif v. United States*, 139 S. Ct. 2191 (2019), Medley filed a supplemental brief raising further constitutional challenges, arguing that *Rehaif* invalidates his indictment and conviction. First, Medley claims the Government's failure to allege knowledge of his "relevant status," *Rehaif*, 139 S. Ct. at 2194, in the charging instrument violated his Fifth Amendment grand jury right and Sixth Amendment notice right. Second, he argues the district court's failure to instruct the jury that it must find the knowledge-of-status element satisfied, and the jury's conviction of Medley when the Government failed to put on sufficient trial evidence relating to this element, violated his Sixth Amendment jury trial right and his right to due process.

2

This Court has previously addressed *Rehaif* errors in the context of a guilty plea. *See United States v. Gary*, 954 F.3d 194, 207 (4th Cir. 2020). But we have not addressed the matter in the context of a trial. Applying plain-error review, we conclude that the asserted *Rehaif* errors violated Medley's substantial rights. Sustaining Medley's conviction under the present circumstances would deprive Medley of several constitutional protections, prohibit him from ever mounting a defense to the knowledge-of-status element, require inappropriate appellate factfinding, and do serious harm to the judicial process. We thus exercise our discretion to notice the errors. Consequently, we vacate Medley's conviction and remand the case to the district court for further proceedings consistent with this Opinion.[1]

I.

On December 31, 2016, members of the District of Columbia Metropolitan Police Department observed Medley standing on a sidewalk with a group of other individuals. As Medley began to distance himself from the group, the officers began to follow him. Medley then increased his speed and ran into a nearby house, passing a resident of the home without speaking to him. The officers stopped as they were trying to enter the premises when they observed a dog coming toward them from inside of the home.

---

[1] Because we find that Medley's *Rehaif* claim is sufficient to resolve this case, we do not address the other questions Medley raised in his opening brief.

The resident of the home was sitting outside. He initially told the officers that he did not know Medley.[2] After about five minutes, the dog was contained, and Medley responded to the officers' calls to exit the house. Medley was immediately placed in handcuffs. The officers then searched the home and recovered a Rock Island Amory .45 caliber semi-automatic handgun ("Rock Island Firearm") and a Glock, model 17, 9mm handgun. They arrested Medley for carrying a firearm without a license, in violation of District of Columbia law. He was ultimately prosecuted for unlawful possession of a firearm, in violation of 22 D.C. Code § 4503(a)(1), based on his possession of the Rock Island Firearm in Washington, D.C. on December 31, 2016. Medley pled guilty to this offense on October 23, 2017, and he was sentenced on December 21, 2017.

On January 23, 2017, Prince George's County Police Department ("PGPD") detectives received a lead from the National Integrated Ballistic Information Network database that linked the shell casings recovered from the scene of a December 30, 2016 carjacking in Prince George's County to the Rock Island Firearm recovered during Medley's arrest. The detectives looked up Medley's D.C. case, discovered he was being held without bond, and traveled to the D.C. jail to interview Medley on January 31, 2017.

During the interview, the detectives advised Medley of his *Miranda* rights. Despite having counsel appointed to him at the time for his D.C. case, Medley did not alert the detectives that he had counsel; nor did they ask. Medley told the detectives that the Rock

---

[2] During the suppression hearing, the district court credited the resident's statements that he did in fact know Medley, Medley was an acquaintance for two years, Medley often comes by to help him, and he had a conversation earlier that day about how he and Medley would celebrate bringing in the new year.

4

Island Firearm was solely in his possession for approximately four days prior to his arrest in D.C. He also stated that he purchased the firearm from an unnamed source in Maryland. He denied any involvement in the carjacking.

On May 8, 2017, a federal grand jury in the District of Maryland returned an indictment charging Medley with one count of carjacking resulting in serious bodily injury, under 18 U.S.C. § 2119(2); one count of using and discharging a firearm during and in relation to a crime of violence, under 18 U.S.C. § 924(c)(1)(A)(iii); and one count of being a felon in possession of a firearm and ammunition, under 18 U.S.C. § 922(g)(1). The latter alleged that Medley, "having been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly and unlawfully possess in and affecting commerce" the Rock Island Firearm. J.A. 4.

Prior to trial, Medley moved to suppress various pieces of evidence, including the statements he made to the PGPD detectives. After a hearing, the district court denied Medley's motions and Medley proceeded to a jury trial, which began on June 18, 2018. The trial concluded on June 22, 2018, and the district court instructed the jury on what it had to find in order to convict Medley of the charges. Relevant here, the district court instructed the jury that it had to find three elements in order to conclude the government sustained its burden of proving Medley guilty of his § 922(g) charge:

> First, that the defendant was convicted, in any court, of a crime punishable by imprisonment for a term exceeding one year, as charged, and that the defendant's civil rights have not been restored following that conviction;
>
> Second, that the defendant knowingly possessed the Rock Island Armory model M1911-A1 .45 caliber semi-automatic firearm, bearing serial

5

number RIA1578527, or the seven cartridges of .45 caliber ammunition, or both, as charged; and

Third, that the possession charged was in or affecting interstate (or foreign) commerce.

J.A. 2654.

The district court then clarified what the jury may consider when determining whether Medley was guilty of this charge. Regarding the first element, the district court instructed the jury that "[t]he parties have stipulated (that is, agreed) that the defendant was convicted of a crime punishable by imprisonment for a term exceeding one year," and that this conviction may only be considered "for the fact that it exists." J.A. 2655. The district court directed the jury that it was "not to consider it for any other purpose." J.A. 2655.

With respect to the second element, the district court instructed the jury that it must "find that the defendant knowingly possessed the firearm." J.A. 2656. "This means," the court continued, "that he possessed the firearm purposely and voluntarily, and not by accident or mistake." J.A. 2656. "However," the court continued, "the government is not required to prove that the defendant knew that he was breaking the law." J.A. 2657.

Since the third element, that the firearm was in or affecting interstate commerce, was not disputed, the district court informed the jury of this fact. J.A. 2658.

The jury convicted Medley of the § 922(g) charge but acquitted him of the two charges related to the carjacking. However, at sentencing, the district court judge found, by a preponderance of the evidence, that Medley used this firearm in connection with the carjacking. Medley received a four-level enhancement under the Sentencing Guidelines

6

and was sentenced to 78 months of imprisonment, followed by three years of supervised release.

Medley timely appealed. He argued that the district court violated his Sixth Amendment right to counsel by admitting uncounseled statements he made to PGPD detectives after being appointed counsel in another case brought by the same sovereign for the same offense; the district court erred by enhancing his sentence based on a finding that he used the firearm in connection with another felony; and the district court violated his Sixth Amendment right to a jury by sentencing him on the basis of acquitted conduct.

Shortly after the parties briefed this Court on the matters above, the Supreme Court issued its opinion in *Rehaif v. United States*, 139 S. Ct. 2191 (2019). The Court held that "in a prosecution under 18 U.S.C. § 922(g) . . . the Government must prove both that the defendant knew he possessed a firearm and that *he knew he belonged to the relevant category of persons barred from possessing a firearm*." *Id.* at 2200 (emphasis added). As a result, *Rehaif* abrogated longstanding precedent in this Circuit holding that knowledge of one's prohibited status is not an element of a § 922(g) offense. *Compare United States v. Langley*, 62 F.3d 602, 606 (4th Cir. 1995) (en banc) (noting that "it is highly unlikely that Congress intended to make it easier for felons to avoid prosecution by permitting them to claim that they were unaware of their felony status"), *with United States v. Lockhart*, 947 F.3d 187, 196 (4th Cir. 2020) (en banc) (recognizing that *Rehaif* abrogated this Circuit's law regarding § 922(g) offenses). We invited both parties to submit supplemental briefs addressing what impact, if any, *Rehaif* may have on Medley's case.

7

In his supplemental briefing, Medley asks this Court to vacate his conviction and remand with instructions to dismiss the indictment without prejudice. First, Medley claims the Government's failure to allege knowledge of his "relevant status," *Rehaif*, 139 S. Ct. at 2194, in the charging instrument violated his Fifth Amendment grand jury right and Sixth Amendment notice right. Second, he argues the district court's failure to instruct the jury that it must find the knowledge-of-status element satisfied, and the jury's subsequent conviction of Medley when the government failed to put on sufficient trial evidence relating to this element, violated his Sixth Amendment jury trial right and his right to due process. Medley does not claim that a failure to correctly instruct a jury is always prejudicial. However, he contends that a conviction is invalid where, as here, the district court does not instruct the jury on—and a jury does not make a beyond a reasonable doubt finding with respect to—each element of the crime.

## II.

Given the timing of *Rehaif*, Medley was unable to raise these claims in the district court. However, current law governs his claim on appeal, which we review for plain error. *See Henderson v. United States*, 568 U.S. 266, 269 (2013). Under this standard, Medley "must show (1) an error, (2) that is plain, and (3) that affected his substantial rights." *United States v. Dennison*, 925 F.3d 185, 190 (4th Cir. 2019). If he does so, we may use our discretion to correct the error if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

8

The parties agree that, under *Rehaif*, the failure to provide Medley notice of the knowledge-of-status element in his indictment, and the failure to instruct the jury that it must find this element beyond a reasonable doubt, were plain errors. As do we. *See Henderson*, 568 U.S. at 269 (holding that plain error is determined based on the law at the time of appellate review). However, the parties dispute whether these errors affected Medley's substantial rights and the integrity of the judicial proceedings. We find that a survey of this Court's precedent, the Supreme Court's jurisprudence on these issues, and the traditional understanding of the rights involved compel us to resolve this case in favor of Medley. We thus vacate Medley's § 922(g)(1) conviction and remand this case to the district court for further proceedings consistent with this Opinion.

III.

We first consider whether the errors in this case violated Medley's substantial rights.

A. The Indictment

i.

Medley argues that the failure to include the knowledge-of-status element in his indictment affected his substantial rights. Specifically, he claims he was prejudiced by not receiving notice that the Government had to prove he knew his prohibited status at the time of the offense. Medley does not claim an indictment's omission of an element is always prejudicial. However, he contends that defendants are prejudiced when the charging instrument fails to fulfill the notice purpose of an indictment. Since the charging instrument here failed to give any indication that the Government would have to show that

9

Medley knew his prohibited status, he asserts that it did not provide the constitutional protections that an indictment must. Consequently, Medley asks us to hold that his substantial rights were violated.

The Government disagrees. The Government argues that Medley's substantial rights were not violated by the flawed indictment. The Government does not contest that it was required to include the knowledge-of-status element in Medley's indictment. Nor does the Government contend that the charging instrument provided Medley with sufficient notice of the accusations against him. Instead, the Government insists that precedent requires us to excuse the mistakes in the indictment when it can be determined from the record that the mistakes did not affect the outcome of the proceeding. The Government cites *United States v. Cotton*, 535 U.S. 625 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in support of this position. Because Medley could not show that the outcome would have been different if the knowledge-of-status element was included in the indictment, the Government reasons, the absence of the knowledge-of-status element did not affect Medley's substantial rights.

The task here is to determine whether Medley's substantial rights were violated by not being made aware of the knowledge-of-status element. On this question, we do not write on a blank slate. As both parties agree, binding precedent provides us with a framework to answer whether Medley's substantial rights were violated by not having the knowledge-of-status element included in his indictment. We now turn to that precedent.

"Any discussion of the purpose served by a grand jury indictment in the administration of federal criminal law must begin with the Fifth and Sixth Amendments to the Constitution." *Russell v. United States*, 369 U.S. 749, 760 (1962). The Fifth Amendment to the United States Constitution requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. The Sixth Amendment ensures that the indictment should inform the accused "of the nature and cause of the accusation" against him. U.S. Const. amend. VI. These constitutional guarantees are both brought to bear here. The basic purpose of a grand jury indictment is to provide "a fair method for instituting criminal proceedings against persons believed to have committed a crime." *Russell*, 369 U.S. at 761.

Courts have long held that an indictment that omits an essential element of an offense is deficient. *See Apprendi*, 530 U.S. at 500–18 (Thomas, J., concurring) (discussing cases and treatises since the 1840's, which repeatedly emphasize the importance of including every element in an indictment); *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) (holding that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt"); *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir. 1988) (en banc) ("It is well established that an indictment is defective if it fails to allege elements of scienter that are expressly contained

in the statute that describes the offense."). Thus, "[a]s a general rule, criminal proceedings were submitted to a jury after being initiated by an indictment containing 'all the facts and circumstances which constitute the offence, . . . stated with such certainty and precision, that the defendant . . . may be enabled to determine the species of offence they constitute, in order that he may prepare his defence accordingly . . . and that there may be no doubt as to the judgment which should be given, if the defendant be convicted.'" *Apprendi*, 530 U.S. at 478 (quoting J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862)); *see also United States v. Daniels*, 973 F.2d 272, 274 (4th Cir. 1992) ("This court, sitting en banc, has left no room for doubt as to the law in this circuit concerning the requirements of a constitutionally adequate indictment. Every essential element of an offense must be charged in the body of an indictment, and the inclusion of a reference to the statute will not cure the failure to do so."). The inquiry here is whether a defect in Medley's indictment is prejudicial when it fails to provide him with notice of the offense he was charged with—a question that places us within the arena of *Apprendi* and its progeny. *See id.* at 476–81 (discussing the importance of including every element of a crime in the indictment); *see also Alleyne v. United States*, 570 U.S. 99, 122, 133 (2013) (Breyer, J., concurring) (noting that "*Apprendi* has now defined the relevant legal regime for an additional decade").

In *Apprendi*, the appellant was convicted of second-degree possession of a firearm, punishable by a term of imprisonment between five and 10 years. However, he was sentenced to 12 years of imprisonment under the state's hate crime law, which permitted an enhanced sentence between 10 and 20 years of imprisonment if the sentencing judge

12

found by a preponderance of the evidence that the crime was motivated by racial animus. The Supreme Court reversed and remanded. In doing so, it noted that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Apprendi*, 530 U.S at 476.

In *United States v. Promise*, this Court, sitting en banc, confronted the question of how to apply plain error review when a defendant's indictment failed to include an essential element. 255 F.3d 150 (4th Cir. 2001). Following *Apprendi*, we held "the district court committed plain error in failing to treat the specific amount of cocaine base attributed to [the defendant] as an element of the offense." *Promise*, 255 F.3d at 152. We further noted that because the indictment failed to allege, and the jury failed to find, this additional element, the appellant's substantial rights were violated. *Id.* at 160–62. Nevertheless, applying *Olano*'s fourth prong, a plurality of the Court declined to notice the error because "witness after witness testified" that the appellant supplied a sufficient quantity of drugs to warrant the sentence. *Id.* at 163.[3] Although this conclusion was heavily criticized by the partial dissent as "antithetical to our system of justice," *id.* at 187 (Motz, J., concurring in part and dissenting in part, and dissenting from the judgment), the opinion defended the decision by balancing numerous considerations—including "the strength of the

---

[3] Judge Wilkins announced the judgment of the court and delivered the opinion of the court with respect to Parts I and IIA–C, which evaluated *Olano*'s first three prongs. Part IID (evaluating the appellant's claim under *Olano*'s fourth prong) was not joined by a majority of the court, thus Judge Wilkins spoke only for a plurality.

13

Government's evidence, the manifest adequacy of notice, and [appellant's] failure to contest drug quantity despite this notice." *Id.* at 164 n.9.

Note, however, that a majority of the court agreed that the defective indictment affected the defendant's substantial rights. *Compare Promise*, 225 F.3d at 160–62 ("We therefore conclude that [appellant] has demonstrated that this error affected his substantial rights."), *with id.* at 186 (Motz, J., joined by Widener, Michael, and King, JJ.) ("This plain error not only clearly affects [the appellant's] substantial rights, it also goes to the very heart of the judicial process."). Indeed, when responding to the partial dissent's claim that precedent requires a *per se* rule for defective indictments, the plurality claimed that precedent "only requires us to conclude that such omissions from the indictment necessarily affect a defendant's substantial rights, regardless of whether the defendant had actual notice." *Id.* at 164 n.9. "But the fact that the error affects substantial rights (the third prong of the plain error inquiry)," the plurality continued, "does not compel us to notice the error (the final prong)." *Id.* There was general agreement, however, that a defective indictment affected a defendant's substantial rights, satisfying *Olano*'s third prong.

To be sure, this Court was equally divided as to whether such errors ought to be corrected. *Compare Promise*, 255 F.3d at 161–64 (Wilkins, J., joined by Wilkinson, C.J., and Williams and Traxler, JJ.) (declining to notice the plain error even though it affected the Appellant's substantial rights), *with id.* at 190 (Motz, J., joined by Widener, Michael, and King, JJ.) ("Certainly, sentencing a man for a crime for which he has been neither charged nor convicted seriously affects the fairness, integrity, and public reputation of

judicial proceedings."). Because the concurring opinions found the conviction valid on other grounds, however, the district court's judgment was affirmed, and the question of how to evaluate defective indictments under *Olano*'s fourth prong was left open.

This Court attempted to resolve that open question in *United States v. Cotton*, 261 F.3d 397, 404 (4th Cir. 2001), *rev'd*, 535 U.S. 625 (2002). We again found plain error because the indictment lacked an allegation of a specific threshold drug quantity. *Id.* at 403. We also noted that our precedent required holding that a defective indictment violated a defendant's substantial rights. *Id.*; *see also id.* at 411 (Wilkinson, J., dissenting) ("*Promise* makes clear that this error affected the defendant's substantial rights."). Yet despite the Government's contention that "the evidence adduced at trial overwhelmingly" proves the additional element, we stated that Supreme Court precedent required us to hold that a sentencing court exceeds its jurisdiction when sentencing a defendant on a defective indictment. *Id.* at 404–07. Accordingly, we vacated the defendant's sentence and remanded the case.

Our decision was overturned by the Supreme Court in *United States v. Cotton*, 535 U.S. 625 (2002). The Court overruled its prior holding that indictment defects are jurisdictional. *Id.* at 629–31 (overruling *Ex parte Bain*, 121 U.S. 1 (1887)). In doing so, however, the Court failed to address whether indictment defects satisfied the third prong of the plain-error inquiry. *Id.* at 632–33 ("[W]e need not resolve whether respondents satisfy this element of the plain-error inquiry, because even assuming respondents' substantial rights were affected, the error did not seriously affect the fairness, integrity, or

15

public reputation of judicial proceedings.")[4] Because the trial evidence supporting the element omitted from the indictment was "overwhelming" and "essentially uncontroverted," the Court declined to exercise its discretion to notice the error. *Id.* at 632–34.

To our knowledge, the Supreme Court has never denied that a constitutionally deficient indictment is prejudicial under *Olano*'s third prong. Indeed, the Court's treatment of indictments suggests the opposite. *See Silber v. United States*, 370 U.S. 717, 717 (1962) (reversing judgment for plain error as a result of a defective indictment); *see also Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018) (citing *Silber* approvingly); *Russell*, 369 U.S. at 770 ("To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure."); *Promise*, 255 F.3d at 186 (Motz, J., concurring in part and dissenting in part, and dissenting from the judgment) (noting that of all the cases the *Olano* Court listed as setting forth the correct plain error standard, the only case where the error was noticed and corrected involved a defective indictment).

After *Cotton*, this Court, for its part, has suggested that a defendant is prejudiced by an incomplete indictment if "the protections provided by an indictment were . . .

---

[4] The Court also explicitly declined to resolve the question of whether indictment errors are structural. *Cotton*, 535 U.S. at 632 (declining to address the argument that "an indictment error falls within the 'limited class' of 'structural errors'"); *cf. United States v. Floresca*, 38 F.3d 706, 712 (4th Cir. 1994) (en banc) (noting that constructive amendments to an indictment "are not subject to review for harmlessness [because] the Supreme Court would consider them to be 'structural defects' in the trial mechanism").

compromised." *United States v. Carrington*, 301 F.3d 204, 210 (4th Cir. 2002). Those protections include "the right (1) to be notified of the charges against him by a description of each element of the offense, and (2) to be provided an accurate record of the charges against him so that he could plead an acquittal or conviction on the charges as a bar to a subsequent effort to prosecute him for the same offense." *Id.* at 209; *cf. Hamling v. United States*, 418 U.S. 87, 117 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."). Accordingly, the present case calls for us to ask whether Medley's indictment provided him with adequate notice of the charges against him and sufficiently described the elements of the offense.

iii.

Medley argues that, even under its most liberal construction, his charging instrument fails to put him on notice of the knowledge-of-status element and does not describe the element at all. We agree. The Government has not provided any convincing reason to hold that Medley's indictment fulfilled the notice function of an indictment. Nor could it. As the Supreme Court has put it, "the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted." *Apprendi*, 530 U.S. at 490 n.15 (quoting *United States v. Reese*, 92 U.S. 214, 232–33 (1875) (Clifford, J., concurring)). Here, it did not. The record adequately shows that neither the indictment's charging language, nor its factual allegations, provided notice that Medley would have to defend against the allegation that he knew his prohibited status.

17

In fact, the opposite is true. Our prior holding in *Langley* inaccurately notified Medley that the Government was *not* required to prove that he knew his prohibited status. *Langley*, 62 F.3d at 606 (holding that § 922(g) does not require the Government to prove that a defendant was aware of his felony status). As a consequence, all the gatekeepers involved—the defense counsel, the judge, and the government—were operating under a false assumption that the Government did not have to prove Medley knew his prohibited status. Accordingly, Medley did not receive (even constructive) notice; nor did he receive a sufficient description of the accusations against him. Since Medley's indictment failed to satisfy the notice function of an indictment through its charging language and description of overt acts, its defects violated Medley's substantial rights. *Cf. Carrington*, 301 F.3d at 210 (noting that "the protections provided by an indictment were not compromised" when, although not included in the charging language, the drug quantity was included in the description of overt acts); [5] *see also United States v. Carr*, 303 F.3d 539, 544 (4th Cir.

---

[5] Admittedly, there is potential tension between *Carrington*'s holding that an omission of an element from an indictment may not violate a defendant's substantial rights so long as its description of facts in the indictment provides a defendant with actual notice of the offense against him, *Carrington*, 301 F.3d at 210, and our statement in *Promise* that Supreme Court precedent "requires us to conclude that such omissions from the indictment *necessarily affect a defendant's substantial rights, regardless of whether the defendant had actual notice*," *Promise*, 255 F.3d at 164 n.9 (emphasis added); *id.* at 187 (Motz, J., concurring in part and dissenting in part, and dissenting from the judgment) ("Judge Wilkins also correctly finds that this plain error affected [appellant's] substantial rights and rightly recognizes one of the reasons why this is so."); *see also United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir. 1988) (holding that even though the defendant acquired actual notice of the offense prior to trial, this did not cure the deficiency of his indictment that failed to allege an element of the crime). Under the laws of this Circuit, "the earliest opinion controls, unless the prior opinion has been overruled." *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc). *Carrington* did not suggest that *Promise* was (Continued)

18

2002) (noting that *Cotton* "assumes, of course, that the faulty indictment still provided the defendant with adequate notice of the offense charged"). As a consequence, Medley satisfies *Olano*'s third prong with respect to the indictment error.

## B. The Jury Trial

### i.

Medley's claim for relief does not end there. In addition to being prejudiced by his defective indictment, Medley argues that his substantial rights were violated by the district court's failure to instruct the jury that it had to find Medley knew his prohibited status under the reasonable-doubt standard, and the Government's failure to present sufficient evidence on that point at trial. The Government, on the other hand, argues that Medley was not prejudiced by the error because absent the error the outcome of the trial "would have been identical." Gov. Supp. Br. at 6. Since it could have easily presented evidence to prove the additional element, the Government claims, Medley cannot show that his substantial rights were violated by the omission of the knowledge-of-status element. To

---

overruled—and, indeed, cited *Promise* approvingly. *See Carrington*, 301 F.3d at 209–11. Nonetheless, *Carrington* took what we had previously determined to be considerations at *Olano*'s fourth prong and applied them at *Olano*'s third prong. *Compare Promise*, 255 F.3d at 164 n.9 (rejecting appellant's claim under *Olano*'s fourth prong because he received sufficient notice), *with Carrington*, 301 F.3d at 209 (rejecting appellant's claim under *Olano*'s third prong because he received sufficient notice). However, because we conclude that Medley's substantial rights were violated even under *Carrington*'s framework, and neither party asks us to consider whether Medley's substantial rights were violated regardless of whether he had actual notice, we need not resolve the potential tension between our precedent here. Under both *Promise* and *Carrington*, we are required to hold the defective indictment violated Medley's substantial rights.

resolve the issue, we must examine whether the circumstances at trial affected Medley's substantial right to trial by jury and his right to due process.

ii.

Again, we do not write on a blank slate. We faced a similar situation in *United States v. Rogers*, 18 F.3d 265, 265 (4th Cir. 1994). There, the appellant asked us to vacate his conviction because of improper instructions given to the jury. Following then-existing law in this Circuit, the district court instructed the jury on the willfulness element of 31 U.S.C. § 5324 and § 5322(a) by stating the following:

> Willful means no more than the Defendant charged with the duty knows what he is doing. It does not mean, in addition, he must suppose he is breaking the law.
>
> The Government need not show that the Defendant had the specific intent to violate the law regarding the structuring of currency transactions or causing a report not to be filed or filed with a material misstatement of fact.

*Id.* at 267. However, before the appellant's case was heard on appeal, the Supreme Court, in *Ratzlaf v. United States*, 510 U.S. 135 (1994), reversed the prior law of this Circuit. The Supreme Court held that a conviction for these crimes "required the government to prove, and the district court to so instruct, that the defendant 'knew the structuring he undertook was unlawful' and reversed the conviction because of the erroneous instructions given." *Rogers*, 18 F.3d at 267 (quoting *Ratzlaf*, 510 U.S. at 138).

Because the appellant did not object to the jury instructions at trial, we reviewed for plain error. Applying the law at the time of the decision, we noted that "the failure to instruct on the defendant's knowledge of the illegality of his own conduct [was] an erroneous omission of an essential element of the offense charged, and thus me[t] the first

20

two [prongs] of *Olano.*" *Rogers*, 18 F.3d at 268. We also held that the failure to instruct "prejudiced the defendant here, because the jury could not have been expected to make a finding beyond a reasonable doubt as to [defendant]'s knowledge of the illegality of his structuring." *Id.* And "since due process requires 'proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [a defendant] is charged,'" *id.* (quoting *In re Winship*, 397 U.S. 358, 364 (1970)), we held that the error was one that seriously affected the fairness, integrity, and public reputation of the judicial proceedings and therefore vacated the convictions.

Notwithstanding our decision in *Rogers*, this Court went on to conclude that "instructing the jury on the conclusiveness of an essential element" is a structural error that is not susceptible to harmless error review in *United States v. Johnson*, 71 F.3d 139, 144 (4th Cir. 1995).[6] *See United States v. David*, 83 F.3d 638, 647 (4th Cir. 1996) (noting that "the failure to instruct on an element of the crime . . . is an error not susceptible to harmless error analysis"). However, this holding was effectively rendered incorrect by the Supreme Court in *Neder v. United States*, 527 U.S. 1 (1999). There, the Court considered the effect of an erroneous jury instruction, where the trial judge told the jury it "need not consider" the materiality of false statements. *Id.* at 6. Contrary to the trial judge's instruction, the

---

[6] *Johnson*'s analysis was about harmless, not plain, error review. However, because the only difference is who bears the burden of proof, harmless-error cases are "instructive" when we review for plain error. *See United States v. Strickland*, 245 F.3d 368, 379–80 (4th Cir. 2001) ("While the harmless error analysis imposes the burden of showing an absence of prejudice on the government and the plain-error analysis under Rule 52(b) imposes the burden of showing prejudice on the defendant, in both cases the prejudice turns on whether substantial rights of the defendant were affected."). Accordingly, we rely herein on both harmless and plain error cases.

Court noted, materiality was an element of the offense, and that element had to be submitted to the jury. Nonetheless, the Court continued, "an instruction that omits an element of the offense does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Id.* at 9. Specifically, the Court stated that a defendant is not prejudiced by an erroneous jury instruction "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Id.* at 17. Since "[a]t trial, the Government introduced evidence that [appellant] failed to report over $5 million in income from the loans he obtained," and it was generally accepted by courts that under 26 U.S.C. § 7206(1) "any failure to report income is material," the Court concluded that "no jury could reasonably find that [appellant's] failure to report substantial amounts of income on his tax returns was not 'a material matter.'" *Id.* at 16.

After *Neder*, this Court has returned to assessing erroneous jury instructions as non-structural errors subject to plain error review. *See United States v. Brown*, 202 F.3d 691, 698 n.13 (4th Cir. 2000) (citing *Rogers*, 18 F.3d at 268). In so doing, we have recognized a few situations where failure to instruct on an element is not prejudicial. For example, in *Brown* we noted that when assessing whether a defendant is prejudiced by a jury instruction omission, we "ask the question: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?'" 202 F.3d at 699 (quoting *Neder*, 527 U.S. at 18). To guide our inquiry, *Brown* set forth three scenarios that would permit us to conclude that a defendant was not prejudiced by an omitted element: namely, when

22

1) "a jury necessarily made th[e] findings notwithstanding the omission," 2) "the omitted element was uncontested and supported by overwhelming evidence," or 3) "the element was genuinely contested," but "there is [no] evidence upon which a jury could have reached a contrary finding." *Id.* In light of the *Brown* framework for determining whether incorrect jury instructions are prejudicial, and our holding in *Rogers*, Medley asks us to hold that he was prejudiced by the omission of the knowledge-of-status element and the lack of evidence presented at trial to prove this element.

iii.

Neither party argues that the first and third method for determining prejudice mentioned in *Brown* are relevant to this case. There is nothing in the record to suggest the jury made a necessary finding that Medley knew of his prohibited status; nor is there anything in the record to suggest Medley tried to genuinely contest the knowledge-of-status element. Here, the dispute is over whether we can hold that Medley was prejudiced when there was not "overwhelming evidence" of Medley's knowledge of his prohibited status presented at trial and Medley did not contest this knowledge.

Medley argues that the only reason the element was uncontested was because settled circuit law at the time meant that any attempt to contest his lack of knowledge would have been futile. The Government counters that it would have easily proven Medley's knowledge of his prohibited status, and the only reason sufficient evidence was not introduced at trial was because Medley sought to exclude this evidence as unfairly prejudicial. *Cf. Old Chief v. United States*, 519 U.S. 172 (1997) (holding that the government cannot introduce evidence concerning the nature of a prior offense when a

23

defendant concedes the fact of a prior conviction). The Government further argues that when looking at the record "it is fair to conclude that Medley was well-aware of the facts that prohibited him from possessing a firearm." Gov. Supp. Br. at 8.

The Government's contention here is not baseless. In some situations, assessing whether the Government proved the elements of the offense by "overwhelming" and "uncontroverted" evidence requires us to look at the trial record in order to glean whether the jury verdict would have been the same absent the erroneous instruction. *Brown*, 202 F.3d at 700 (citing *Neder*, 527 U.S. at 17). But where, as here, we do not have a contested element "because the element emerged as a consequence of a change in the law after trial," we have held that it is inappropriate to speculate whether a defendant could have challenged the element that was not then at issue. *Brown*, 202 F.3d at 700 n.18. As we put the point previously:

> [W]here the Government does not even charge the defendant with those specific violations, defense counsel could have made the strategic decision to spend valuable time before the jury challenging the Government's evidence on the essential elements. Speculating that a defendant could not have challenged an element not then at issue represents an untoward leap of logic.

*Id.*

The same must be said here. Because Medley was never put on notice that the Government had to prove he knew his prohibited status, Medley's knowledge of his prohibited status was orthogonal to the issues raised at trial. Thus, any time spent before the jury challenging what was irrelevant to the case at hand would have been futile. To accept the Government's invitation to speculate how Medley would defend against an

24

element not at issue, then, would represent the type of "untoward leap of logic" the *Brown* Court warns against. 202 F.3d at 700 n.18.

This is especially true when we, as appellate judges, are asked to infer a scienter requirement, which "advance[s the] basic principle of criminal law" that we only penalize those with "a vicious will." *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019). Unlike determining whether an element such as materiality is satisfied, appellate judges are especially ill-equipped to evaluate a defendant's state of mind on a cold record. *See United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015) (rejecting the application of *Neder* because "appellate judges are better equipped to assess materiality than to evaluate states of mind based on a cold record"). Although it may be true that Medley's counsel did not present a defense to his knowledge-of-prohibited status during trial—and, indeed, may have sought to exclude evidence that would have provided proof of the omitted element— the decision was made in the context of not having notice of the actual charge Medley faced. Because it is inappropriate to speculate how Medley might have defended the element in the counterfactual scenario where he was presented with the correct charge against him, we find that the instructional error in this case violated his substantial rights.

iv.

Alternatively, our decision would be the same were we to consider the trial record. The Government suggests that the evidence presented at trial was enough to support a conclusion that Medley knew his prohibited status. As support, the Government points out that the jury heard evidence that Medley fled from police when they approached him in the District of Columbia, and that there was a stipulation between the parties at trial that

25

Medley was prohibited from possessing a firearm. However, the Government correctly refrains from suggesting that the evidence presented at trial *overwhelmingly* proved Medley's guilt. Instead, the Government claims this evidence is "supportive of Medley's consciousness of guilt." Gov. Supp. Br. at 7.

Even if true, that is not enough. Precedent requires us to "conclude *beyond a reasonable doubt* that the jury verdict would have been the same absent the error." *Neder*, 527 U.S. at 19; *see also Brown*, 202 F.3d at 699 ("We . . . ask the question: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"). That burden was not met here. *Cf. Strickland*, 245 F.3d at 380 (concluding beyond a reasonable doubt that "the jury verdict would have been the same had the jury been asked specifically to find" the element found by the sentencing judge). Inferring that someone knew he was prohibited from possessing a firearm at the time of the offense based on a stipulation at trial that he was in fact a prohibited person would render the Supreme Court's language in *Rehaif* pointless. *See, e.g.*, *Rehaif*, 139 S. Ct. at 2197 ("Nor do we believe that Congress would have expected defendants under § 922(g) and § 924(a)(2) to know their own statuses."); *cf. id.* at 2201 (Alito, J., dissenting) ("Today's decision will make it significantly harder to convict persons falling into some of these categories, and the decision will create a mountain of problems with respect to the thousands of prisoners currently serving terms for § 922(g) convictions."). In addition, Medley's attempt to evade the police in the District of Columbia does not indicate—much less overwhelmingly prove—that he knew his prohibited status under federal law. *See United States v. Aka*, 339 F. Supp. 3d 11, 19 (D.D.C. 2018) (noting that D.C. firearms statutes do not track the federal

26

firearms statutes). Indeed, Medley was initially placed under arrest for carrying a pistol without a license in violation of 22 D.C. Code § 4503, *see* J.A. 650, not for being a felon in possession of a firearm. Thus, even a consideration of the trial evidence would lead us to the same conclusion—Medley was prejudiced by the district court's failure to instruct the jury that it had to find Medley knew his prohibited status, and the Government's failure to present sufficient evidence on that point at trial.

## C. Cumulative Effect of the Errors

Even though we find that the indictment and trial errors independently violated Medley's substantial rights, it is worth further stating that the cumulative effect of those errors was also prejudicial. In some instances where courts excuse indictment errors, the defects of the indictment are thought to be cured because the defendant receives adequate notice before trial and the charge to the petit jury mitigates the concern of the error. *See, e.g.*, *Carr*, 303 F.3d at 544 ("[W]hile the element of 'by fire or an explosive' was omitted from the grand jury indictment, it was included in the charge to the petit jury, which found the element beyond a reasonable doubt when it returned a guilty verdict."). *But see United States v. Kingrea*, 573 F.3d 186, 192 (4th Cir. 2009) ("[W]e agree with [petitioner] that the indictment against him was insufficient and that the district court's subsequent jury instructions could not cure this fatal defect."). Likewise, when courts excuse instructional errors, it is often in the context of the defendant receiving adequate notice in his indictment (even if there remains a question on whether the issue is a sentencing factor for the judge or an element for the jury to decide). *See, e.g.*, *Neder*, 527 U.S. at 6 ("[T]he District Court instructed the jury that, to convict on the tax offenses, it 'need not consider' the materiality

27

of any false statements 'even though that language is used in the indictment.'"); *id.* at 14 ("The trial court, following existing law, ruled that the question of materiality was for the court, not the jury.").

Here, the errors occurred at the inception of the Government's case against Medley and continued throughout. Put another way, the error was not just a single, simple procedural error—but a combination of errors that tainted many of the basic protections that permit us to regard criminal punishment as fundamentally fair. First, the Government failed to provide Medley with adequate notice of the charges against him in his indictment. Second, Medley's conviction was predicated on an indictment that fails to allege an essential element of the offense and on a verdict by a jury that was not instructed on that element. Third, scant evidence regarding the omitted element was presented at trial. Finally, Medley had no reason to contest the omitted element at any point in the proceedings and, therefore, did not contest the element. We find that the compilation of these errors also affected Medley's substantial rights.

## IV.

Having found that Medley's substantial rights were violated by these errors, we must decide whether to exercise our discretion to correct them. *See Olano*, 507 U.S. at 732. Correcting an error is not automatic. Rather, we exercise our discretion only "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Id*. (internal citations omitted). As the Supreme Court has made clear, "[a]n error may 'seriously affect the fairness, integrity or public reputation of judicial

28

proceedings' independent of the defendant's innocence." *Id.* at 736–37 (internal citations omitted). "By focusing instead on principles of fairness, integrity, and public reputation, [c]ourt[s] recognize[] a broad category of errors that warrant correction on plain-error review." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (discussing *Olano*'s fourth prong). With this standard in mind, we find that the errors discussed above fall within the category of errors that warrant correction and, thus, exercise our discretion to notice the errors.

There can be no question that the rights involved in this case are central to upholding the fairness, integrity, and public reputation of our judicial proceedings. "By including the Grand Jury Clause in the Bill of Rights, the Framers—mindful of the intimidating force and presence of a strong national government and the potential for abuse of that force— recognized the need to interpose a group of common local citizens between the accused and the sovereign." *Floresca*, 38 F.3d at 714. And we have previously stated that "the wisdom of the Framers in this regard has stood the test of time; thus, depriving an accused of the protection of the grand jury would be, no less today than yesterday, *intolerably unfair*." *Id.* (emphasis added). Thus, even for certain standalone Fifth Amendment grand jury violations, we have proclaimed that "[w]e do not hesitate to say that convicting a defendant of an unindicted crime affects the fairness, integrity, and public reputation of federal judicial proceedings in a manner most serious." *Id.*; *see also Kingrea*, 573 F.3d at 194 (vacating a conviction because the indictment omitted an essential element).

The other constitutional claims at stake are just as important to protecting the fairness, integrity, and public reputation of our judicial proceedings. The Supreme Court

29

has stated that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 243 n.6; *Apprendi*, 530 U.S. at 476 (same). And it is thought that one's right to a jury trial "ranks among the most essential: the right to put the State to its burden, in a jury trial that comports with the Sixth Amendment, before facing criminal punishment." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1409 (2020) (Sotomayor, J., concurring). Thus, this Court has noted that failing to correct certain standalone Sixth Amendment jury trial violations would "seriously affect the fairness, integrity, or public reputation of the judiciary." *United States v. Ramirez-Castillo*, 748 F.3d 205, 217 (4th Cir. 2014); *see also Rogers*, 18 F.3d at 268. We have said that this right, "which includes, 'as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of guilty,' is fundamental." *Ramirez-Castillo*, 748 F.3d at 217 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993)). Indeed, when appellants do not waive "their fundamental right to a trial by jury," yet they are incarcerated based on a judge's determination of guilt, we have declared that "[r]egardless of the evidence presented against [a]ppellant at trial—which we acknowledge was substantial— we cannot condone this practice." *Ramirez-Castillo*, 748 F.3d at 217 (citing *United States v. Cedelle*, 89 F.3d 181, 186 n.4 (4th Cir. 1996) (recognizing that "circumstances may exist where the proceedings contain an error that seriously affects the fairness, integrity, or public reputation of the judiciary even though the record demonstrates that the defendant is guilty")).

30

But we need not consider these errors independent of each other here. Regardless of how we would evaluate the standalone *Rehaif* errors, given the procedural and factual circumstances of this case, we hold that the failure of the indictment to provide proper notice, combined with the district court's failure to instruct the jury that it had to find Medley knew his prohibited status under the reasonable-doubt standard (and the Government's failure to present sufficient evidence on that point at trial), are "sufficient to undermine confidence in the outcome of the proceedings." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004) (internal citations omitted); *cf. Lockhart*, 947 F.3d at 196 (noting that aggregate errors may undermine the confidence in the judicial proceedings).

Evaluating these errors in the aggregate also helps to further understand how this case differs from those where the Supreme Court has been willing to excuse the individual errors. *See, e.g*, *Cotton*, 535 U.S. at 625 (2002) (indictment); *Neder*, 527 U.S. at 1 (jury instruction); *Johnson v. United States*, 520 U.S. 461 (1997) (jury instruction). As revealed by those decisions, a defect in an indictment or a jury instruction will generally not be corrected at *Olano*'s fourth prong when the record evidence related to the defective part of the indictment or instruction is "overwhelming" *and* "essentially uncontroverted." Although the Government has not had to prove the knowledge-of-status element beyond a reasonable doubt,[7] it has provided substantial post-trial evidence supporting Medley's

---

[7] We do not intend to mitigate this point. It is an important feature of our criminal justice system that the failure to prove one element of a crime is equivalent to the failure to prove all elements of a crime—in that they both prevent conviction. *See Neder*, 527 U.S. at 33 (Scalia, J., dissenting) (questioning whether "taking one of the elements of the crime away from the jury should be treated differently from taking all of them away—since (Continued)

knowledge of his prohibited status, signifying that Medley was incarcerated for over sixteen years after being convicted of second-degree murder. However, the "essentially uncontroverted" requirement has not been satisfied. It would be unjust to conclude that the evidence supporting the knowledge-of-status element is "essentially uncontroverted" when Medley had no reason to contest that element during pre-trial, trial, or sentencing proceedings. Unlike *Cotton*, *Neder*, and *Johnson*, where the defendants received notice of the element and had substantial reason to contest the element, that is not the case here. Moreover, in those cases, the district court judges had already found that the element was proven and we—as appellate judges—were not asked to cast a defendant's constitutional rights aside and trample over the grand jury and petit jury's function. We decline the Government's invitation to engage in the level of judicial factfinding that would be required to affirm Medley's conviction.

Indeed, the facts of the case at bar should give anyone pause about relying on an efficient scheme of criminal justice that depends too much on the State. *See Apprendi*, 530 U.S. at 498 (Scalia, J., concurring) ("Judges, it is sometimes necessary to remind ourselves, are part of the State-and an increasingly bureaucratic part of it, at that."). Medley was indicted on a defective charging instrument. Medley chose to exercise his jury trial right and defend himself against three separate counts of criminal conduct. The jury acquitted Medley of two counts, and it convicted him of the third—based on what we now know was

---

failure to prove one, no less than failure to prove all, utterly prevents conviction"). Thus, although sometimes excusable, it is worth pausing anytime we have a case where the Government was not put to its burden.

a misunderstanding of the law.[8]  Ignoring the errors above because it may appear to us that the Government could have proven the additional element had they been given a chance to do so at trial and before the grand jury would ultimately reduce itself "to the idea that 'the judges know best.'"  *Russell v. United States*, 369 U.S. 749, 779 (1962) (Douglas, J., concurring).  Although convenient, we cannot succumb to the belief that this is true.  As judges, we must refrain from engaging in counterfactual inquiries that force us to stray too far beyond our Article III powers.  Affirming Medley's conviction would require us to usurp the role of both the grand and petit juries and engage in inappropriate judicial factfinding.  Put another way, "too much went wrong here."  *Lockhart*, 947 F.3d at 199 (4th Cir. 2020) (Wilkinson, J., concurring).[9]

Were this Court to affirm Medley's conviction "simply to avoid burdening [the] criminal justice system[]," *Ramos*, 140 S. Ct. at 1410, we would diminish the public faith in the integrity of our courts.  What gives people confidence in our justice system is not that we merely get things right.  *See Cedelle*, 89 F.3d at 186 n.4 (4th Cir. 1996) (recognizing circumstances "may exist where the proceedings contain an error that seriously affects the fairness, integrity, or public reputation of the judiciary even though the record demonstrates

---

[8] In many ways, this case forces us to once again confront Justice Scalia's implicit question in *Apprendi*:  "what, exactly, does the 'right to trial by jury' guarantee?" *Alleyne*, 570 U.S. at 123 (Breyer, J., concurring) (quoting *Apprendi*, 530 U.S. at 498–99).  If the right to trial by jury does not guarantee relief in the case at bar, it is hard to see what exactly it *does* guarantee.

[9] This is not to suggest that a single error would never warrant correction.  *Cf. Kingrea*, 573 F.3d at 192 (holding that the indictment "was insufficient and that the district court's subsequent jury instructions could not cure this fatal defect").

33

that the defendant is guilty"). Rather, it is that we live in a system that upholds the rule of law even when it is inconvenient to do so.

In short, the issue here is about whether the fairness, integrity, and public reputation of judicial proceedings are in question where a defendant was not put on notice of an essential element, did not have the Government list all the elements at trial, did not have the jury of his peers hear sufficient evidence regarding an element, and did not have the district court identify the element in its instructions to the jury. Taken individually, each of these would give us pause. Taken collectively, we are confident that failing to notice these errors would seriously affect the fairness, integrity, and public reputation of judicial proceedings.

## V.

For all the reasons stated above, we find that the failure to include the knowledge-of-status element in Medley's indictment was a plain error affecting his substantial rights. We also find that the district court's failure to instruct the jury that it had to find Medley knew his prohibited status, and the Government's failure to present sufficient evidence on that point at trial, was a plain error affecting Medley's substantial rights. And, finally, we find that these collective errors seriously affect the fairness, integrity, and public reputation of the court. We therefore vacate Medley's § 922(g)(1) conviction and remand with instructions to the district court to enter judgment dismissing this count without prejudice.

*VACATED AND REMANDED,*
*WITH INSTRUCTIONS*

34

QUATTLEBAUM, Circuit Judge, dissenting:

After a federal jury convicted Jevon Medley of unlawful possession of a firearm as a felon under 18 U.S.C. § 922(g)(1), and while his case was pending on appeal, the Supreme Court announced its decision in *Rehaif v. United States*, 139 S. Ct. 2191 (2019). There, the Court held that in § 922(g) prosecutions, the government must prove that the defendant knowingly possessed the firearm and that he knew that he had been convicted of a crime punishable by more than one year in prison. In this appeal, Medley challenges the omission of the knowledge-of-status element from his indictment and jury instructions. Importantly, because Medley did not raise these claims before the district court, we review them for plain error.

Plain-error review, as is well known, requires us to determine more than whether a clear error occurred. We must also ask whether the error was prejudicial and, if uncorrected, would result in a miscarriage of justice. Helpfully, the Supreme Court has defined in simple, logical terms the question that guides this prejudice inquiry: did the error likely make a difference in the outcome of the lower court proceeding? *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016). And similarly, the Court has explained that a miscarriage of justice results when an error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation omitted). Generally, such a miscarriage does not occur when, despite the error, the proceedings "resulted in a fair and reliable determination of guilt." *United States v. Ramirez-Castillo*, 748 F.3d 205, 217 (4th Cir. 2014) (citing *United States v. Cedelle*, 89 F.3d 181, 186 (4th Cir. 1996)). This common-sense approach ensures that we do not needlessly vacate a lower-court decision

35

when it was likely unattributable to the error or when, despite the error, the proceedings resulted in a fair and reliable outcome.

If ever there was a case in which the errors likely had no effect on the outcome of the proceedings, and the proceedings led to a fair and reliable determination of guilt, this is it. To be sure, the felon-in-possession charge in Medley's indictment did not allege that he knew he was previously convicted of "a crime punishable by imprisonment for a term exceeding one year" when he possessed the relevant firearm. 18 U.S.C. § 922(g)(1). And likewise, the district court did not instruct the jury on that element. While those decisions conformed to precedent at the time, we now know they were in error based on the Supreme Court's subsequent decision in *Rehaif*.

But before possessing the firearm, Medley served over twelve years in prison for second-degree murder. And he remained on parole at the time of his arrest. Medley also stipulated at trial he "had been convicted of a crime punishable by imprisonment for a term exceeding one year," and that "[t]he civil rights he forfeited as a result of that conviction, including his right to possess a firearm, had not been restored." J.A. 2430. Accordingly, it is difficult, if not impossible, to imagine that Medley did not know he had been convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1).

Despite this, the majority concludes that the *Rehaif* errors require us to vacate Medley's conviction because they affected his substantial rights and the integrity of the judicial proceedings. Because, in my view, the record evidence overwhelmingly indicates

36

Medley, at the time he possessed the firearm, knew he had been convicted of a crime punishable by more than one year in prison, I disagree with the majority's conclusion. Moreover, I disagree with the standards the majority applies to reach it. First, in determining the errors affected Medley's substantial rights, the majority fails, as our precedent requires, to evaluate whether it is reasonably likely that but for the *Rehaif* errors, the outcome of his trial would have been different. Instead, it applies standards that effectively transform the errors from non-structural to structural errors. Then, in determining the errors affected the integrity of the judicial proceedings, the majority fails to evaluate whether, despite the errors, Medley's trial resulted in a fair and reliable determination of his guilt. Thus, in both the third and fourth prongs of its plain-error review, the majority does not apply the standards dictated by our precedent.

Significantly, the majority's decision also breaks from every other circuit that has addressed these issues. Like our decision in *United States v. Gary*, 954 F.3d 194 (4th Cir. 2020), which addressed the effect of *Rehaif* errors on guilty pleas, we chart our own path on the effect of *Rehaif* errors in the context of a jury trial. In my view, it is the wrong path.

Further, I fear the potential implications of today's decision. That the decision will certainly impact countless challenges to felon-in-possession convictions does not, alone, concern me. What does concern me is the profound impact that will result from the application of legal standards that stray from Supreme Court and Fourth Circuit precedent. And I am concerned that today's decision confuses the well-established standards that

37

guide plain-error review in a way that, if not corrected or clarified, could have effects that ripple beyond felon-in-possession cases.

In addition to the *Rehaif* claims that are the focus of the majority's decision, Medley raises other challenges to his felon-in-possession conviction and sentence. Regarding his conviction, Medley challenges the district court's denial of his motion to suppress statements he made to the police, without the benefit of counsel, about the gun involved in the felon-in-possession charge. Regarding his sentence, he argues that the district court's application of a Sentencing Guidelines enhancement, based on its finding that Medley used the firearm to commit a carjacking, violated his Sixth Amendment right to a jury trial because it was based on acquitted conduct.

For the reasons set forth below, I would reject Medley's *Rehaif* claims and additional challenges, and affirm the judgment of the district court.

I.

On December 30, 2016, Prince George's County, Maryland police officials responded to a report of a carjacking and shooting at an apartment complex. At the scene, they discovered Elton Wright, who had multiple gunshot wounds to his leg and hip. Wright had been walking to his car when a masked man with a gun confronted him and demanded his keys. When Wright tried to flee, the man shot him, took the keys and fled in Wright's car. Wright did not recognize the man, but noted that the gun appeared to be "a .45 . . . or some type of Glock." J.A. 1815, 1826.

38

The next day, Washington, D.C. police on a routine patrol saw Medley nervously move away from a group of friends as they approached. Medley was not at that time a person of interest related to the carjacking. But when the officers identified themselves as police and began to follow Medley, he ran into a nearby house. Medley eventually responded to the officers' calls to exit the house and was detained.

The resident of the house told the officers that he did not know Medley, and that Medley entered his home without permission. He allowed the officers to search the part of the home where Medley had hidden. There, the officers recovered a .45 caliber semi-automatic handgun made by the Rock Island Armory ("Rock Island Firearm") and a 9mm Glock, model 17. They arrested Medley for carrying a firearm without a license, in violation of District of Columbia law.

On January 2, 2017, Medley was charged in D.C. Superior Court with Unlawful Possession of a Firearm by a convicted felon, in violation of 22 D.C. Code § 4503(a)(1), (b)(1). That same day, the D.C. court appointed Medley a lawyer. Three days later, at his preliminary hearing, the court appointed a new lawyer at Medley's request.

After several weeks, Darren Dalton, a detective involved with the Prince George's County Police Department's investigation of the Maryland carjacking, received notice from the National Integrated Ballistic Information Network database that shell casings recovered from the scene of the carjacking were possibly linked to the Rock Island Firearm recovered during Medley's arrest. Dalton asked the county's Firearms Examination Unit for an official comparison and, a few days later, they reported that the shell casings "were

39

identified as having been fired" from the Rock Island Firearm. J.A. 1297. Looking further into Medley's D.C. case, Detective Dalton discovered that Medley was being held in a D.C. jail.

Within days, Detective Dalton and two other officers from Prince George's County traveled to D.C. to interview Medley. Dalton introduced himself to Medley as a Prince George's County detective and explained that he wished to speak about the guns recovered during Medley's D.C. arrest. He said he was not from the D.C. police department and that he was there to discuss a Maryland carjacking investigation, not the details of Medley's D.C. case.

Detective Dalton advised Medley of his *Miranda* rights, and Medley indicated he understood them. During the interview, Medley did not mention his appointed counsel in the D.C. case, ask for the conversation to stop or request a lawyer. Dalton testified that at the time of the interview, he did not know that Medley was represented by an attorney in his D.C. case.

Medley told Detective Dalton that he purchased the Rock Island Firearm four days before his arrest in D.C. He stated that he was the only person to possess the gun during that four-day period. When Medley became hesitant about answering more of Dalton's questions, Dalton stopped the interview.

Based in part on Medley's statements, a federal grand jury in the District of Maryland indicted Medley for carjacking resulting in serious bodily injury, in violation of 18 U.S.C. § 2119(2); using, brandishing, carrying and discharging a firearm during and in

40

relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and possessing a firearm and ammunition as a felon, in violation of 18 U.S.C. § 922(g)(1). The felon-in-possession count listed the Rock Island Firearm recovered during Medley's D.C. arrest as the relevant firearm.

Medley moved to suppress the statements he made to Detective Dalton. He argued that Dalton obtained those statements "in violation of . . . his right to counsel as guaranteed by the Fifth and Sixth Amendments to the United States Constitution." J.A. 8. The district court denied Medley's motion, holding that the officers did not violate Medley's Fifth Amendment rights or Sixth Amendment right to counsel because Medley voluntarily waived those rights by answering Dalton's questions without an attorney present after receiving *Miranda* warnings. The district court explained that because Medley "didn't ask for counsel" and "didn't invoke counsel" after receiving his *Miranda* warnings, the police were free to question him. J.A. 599. Relying on *Montejo v. Louisiana*, 556 U.S. 778 (2009), the court held Medley's waiver of his *Miranda* rights also waived his Sixth Amendment right to counsel.

After a five-day trial,[1] the jury convicted Medley of the felon-in-possession charge, but acquitted him of the two charges related to the carjacking. At sentencing, the presentence investigation report ("PSR") assigned Medley a base offense level of 20 under

---

[1] Before the trial in the District of Maryland, Medley pled guilty in D.C. Superior Court to the felon-in-possession of a firearm charge, in violation of 22 D.C. Code § 4503(a)(1), (b)(1). Medley agreed that if the D.C. case proceeded to trial, the prosecution would have proven that he possessed the Rock Island Firearm on the date of the carjacking.

U.S.S.G. § 2K2.1(a)(4)(A), because of a 1997 conviction for second degree murder. Medley did not object to this base offense level. But he did object to the United States Probation Office ("Probation") adding a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B), based on Medley's use of the Rock Island Firearm in connection with another felony—the carjacking of Elton Wright. This produced a total offense level of 24 and a criminal history category of IV, yielding an advisory Guidelines range of 77–96 months in prison. Medley argued that the § 2K2.1(b)(6)(B) enhancement should not apply because he had been acquitted of the carjacking charges and, therefore, the evidence did not establish that he committed the carjacking. Probation disagreed and declined to amend the PSR.

The district court agreed with Probation finding, by a preponderance of the evidence, that Medley used the Rock Island Firearm in connection with the carjacking of Wright. It then adopted the PSR's enhanced Guidelines calculations and sentenced Medley to 78 months imprisonment, followed by three years of supervised release.

Medley filed a timely notice of appeal, challenging both his conviction and his sentence. As to the conviction, Medley contends the district court violated his Sixth Amendment right to counsel by admitting the statements he made to Maryland police after he was appointed counsel in his D.C. case. Regarding his sentence, Medley first argues that the enhancement violated his Sixth Amendment right to a jury trial because it was based on acquitted conduct. He also contends that the district court clearly erred by enhancing

his sentence after finding—based on a preponderance of the evidence—that he used the Rock Island Firearm in connection with the Maryland carjacking.

Also, in supplemental briefing requested by this Court, Medley argues that under the Supreme Court's recent decision in *Rehaif*, the indictment's failure to charge that he knew he was a felon when he possessed the Rock Island Firearm, and the district court's failure to instruct the jury on that element, requires us to vacate his conviction.

We have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.


## II.

Since the majority's decision addresses only Medley's *Rehaif* challenges, I begin there. As the majority notes, Medley argues that after *Rehaif*, two errors in the trial-court proceedings violated his constitutional rights and require us to vacate his conviction. First, he claims that the indictment failed to allege that when he possessed the Rock Island Firearm, he knew that he had been convicted of a crime punishable by more than one year in prison. Second, Medley argues that the district court failed to instruct the jury on that element, depriving him of his right to have a jury find every element of the charged offense.

Because Medley did not preserve these issues at trial, we review his claims for plain error. *See Puckett v. United States*, 556 U.S. 129, 135 (2009); Fed. R. Crim. P. 52(b). To succeed under plain-error review, a defendant bears the burden to show that: (1) an error occurred; (2) the error was plain; and (3) the error affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Knight*, 606 F.3d 171, 177 (4th

43

Cir. 2010). Finally, if the first three prongs are met, we will only exercise our discretion to correct the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732. The Supreme Court has cautioned that "[m]eeting all four prongs is difficult, as it should be." *Puckett*, 556 U.S. at 135 (internal quotation marks and citation omitted).

For starters, the indictment and jury-instruction deficiencies constitute errors, and those errors were plain. Indeed, the government does not contest these issues. Thus, there is no dispute about whether Medley carried his burden with respect to *Olano*'s first two prongs.

As to the third prong, neither the Supreme Court nor our Court have held that an indictment error "falls within the 'limited class' of 'structural errors' that 'can be corrected regardless of their effect on the outcome.'" *See, e.g., United States v. Cotton*, 535 U.S. 625, 632 (2002). Therefore, we must determine whether omitting the knowledge-of-status element from the indictment affected Medley's substantial rights. *See Olano*, 507 U.S. at 732.

Likewise, the jury instructions' omission of the knowledge-of-status element is not a structural error. While this Court previously held that "the failure to instruct [the jury] on an element of the crime, where the jury never made the constitutionally required findings" was such an error, *United States v. David*, 83 F.3d 638, 647 (4th Cir. 1996), the Supreme Court effectively overruled *David*. In *Neder v. United* States, 527 U.S. 1, 9 (1999), the Court held that the omission of an element in a jury instruction is a non-structural error that

44

"does not *necessarily* render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (emphasis original). Therefore, a jury instruction that omits an element of the offense does not automatically satisfy *Olano*'s third prong.[2]

For non-structural errors under *Olano*'s third prong, the defendant bears the burden of establishing that each error affected his substantial rights through "a showing of individual prejudice." *United States v. Marcus*, 560 U.S. 258, 265 (2010). The Supreme Court has stated that a defendant makes this showing by establishing "a reasonable probability that, but for the error, the outcome of the [district court] proceeding would have been different." *Molina-Martinez*, 136 S. Ct. at 1343 (internal quotation marks and citation omitted); *see United States v. Denton*, 944 F.3d 170, 185 (4th Cir. 2019). Under this standard, "'the fact that an error is not harmless does not necessarily mean it' affected the defendant's substantial rights." *United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998) (citing *United States v. McKinney*, 954 F.2d 471, 475 (7th Cir. 1992)). Therefore, Medley must do more than "establish that it is impossible to tell whether the verdict returned by

---

[2] This case differs from our recent decision in *Gary*, which, as noted above, applied the *Olano* plain-error standard to a *Rehaif* error in the context of a guilty plea. There, Gary pled guilty to being a felon in unlawful possession of a firearm under § 922(g), after the district court advised him of the then-understood elements of a § 922(g) offense. After the district court approved the guilty plea, *Rehaif* was decided, and Gary appealed his sentence, claiming that his plea was not knowing and voluntary because, under Fed. R. Crim. P. 11(b)(1), he was not properly advised on all the required elements of a § 922(g) offense. We vacated Gary's conviction after holding that the Rule 11 error was a structural error that satisfied all four prongs of *Olano*. But because *Gary* involved a *Rehaif* error in the context of a guilty plea, and turned on issues unique to that context, it does not control our analysis here.

the jury" was a result of the error. *Hastings*, 134 F.3d at 243. Instead, he must show that it is reasonably probable that the error had a "substantial and injurious effect or influence in determining the . . . verdict." *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004) (citation omitted); *see also Hastings*, 134 F.3d at 243–44. Accordingly, the question here is whether there is a reasonable probability that, but for either error, Medley would not have been convicted of the felon-in-possession charge.

But even if the district court's failure to include the knowledge-of-status element in the indictment and the jury instructions affected Medley's substantial rights,[3] we may not, under *Olano*'s fourth prong, exercise our discretion to correct these errors unless they "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Cotton*, 535 U.S. at 632–33. And central to this analysis in a criminal case "is a determination of whether, based on the record in its entirety, the proceedings against the accused resulted in a fair and reliable determination of guilt." *Ramirez-Castillo*, 748 F.3d at 217 (citing *Cedelle*, 89 F.3d at 186).

---

[3] I do not mean to suggest that Medley has, in fact, met his burden of establishing individual prejudice. In fact, if the full record is considered, Medley plainly would not have. But our Court has yet to determine what evidence may be considered in analysis under *Olano*'s third prong. Our sister circuits are split on this issue. Four circuits permit consideration of the record. *United States v. Ward*, 957 F.3d 691, 695 & n.1 (6th Cir. 2020); *United States v. Reed*, 941 F.3d 1018, 1021 (11th Cir. 2019); *United States v. Hollingshed*, 940 F.3d 410, 415–16 (8th Cir. 2019); *United States v. Benamor*, 937 F.3d 1182, 1189 (9th Cir. 2019). Two have decided that the review should be confined to the trial record. *United States v. Maez*, 960 F.3d 949, 960–61 (7th Cir. 2020); *United States v. Miller*, 954 F.3d 551 (2d Cir. 2020).

Here, the errors did not "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," *Olano*, 507 U.S. at 732, because the record demonstrates that Medley's trial "resulted in a fair and reliable determination of guilt." *Ramirez-Castillo*, 748 F.3d at 217 (citing *Cedelle*, 89 F.3d at 186). First, Medley served over twelve years in prison and was on parole at the time of his January 2017 arrest.[4] In other words, Medley was carrying the Rock Island Firearm, while on parole, after spending over twelve years in jail. It strains credulity to claim that a man who was imprisoned for more than a decade did not know that he had been convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). But there is more. Medley stipulated at trial that prior to December 30, 2016—the date of the Maryland carjacking, and a date on which he admitted to possessing the Rock Island Firearm—he "had been convicted of a crime punishable by imprisonment for a term exceeding one year," and that "[t]he civil rights he forfeited as a result of that conviction, including his right to possess a firearm, had not been restored." J.A. 2430. And Medley's conduct on the day of the arrest provided further circumstantial evidence that he "knew he belonged to the relevant category of persons barred from possessing a firearm." *Rehaif*, 139 S. Ct. at 2220. The record shows that when Medley noticed that he was being followed by police, he ran into a nearby house and attempted to hide the Rock Island Firearm. This is a reasonable indication that his unlawful possession was knowing, and not the result of an "innocent

---

[4] Medley's previous sentence was imposed on September 24, 1997, and he was released from prison on February 16, 2010. JA. 2679, 2685. His parole was scheduled to expire in 2039. J.A. 2685.

mistake." *Id.* at 2197. Accordingly, the record contains "overwhelming" and "essentially uncontroverted" evidence that despite the indictment and jury-instruction errors, Medley knew he had been convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1).

And notably, Medley's case contrasts sharply with the examples of the types of defendants that *Rehaif* sought to protect. For example, Medley is not "a person who was convicted of a prior crime but sentenced only to probation, who does not know that the crime is 'punishable by imprisonment for a term exceeding one year.'" *Rehaif*, 139 U.S. at 2198 (quoting 18 U.S.C. § 922(g)(1)) (emphasis removed). Nor is he being "held strictly liable regarding his status as a felon even though the trial judge had told him repeatedly— but incorrectly—that he would 'leave this courtroom not convicted of a felony.'" *Id.* (quoting *United States v. Games-Perez*, 667 F.3d 1136, 1138 (10th Cir. 2012)). Instead, Medley spent over twelve years in prison as a result of a felony conviction for second-degree murder. And, at trial, he stipulated that on the day he possessed the Rock Island Firearm, he had been convicted of a crime punishable by more than one year in prison, and that his right to possess a firearm had not been restored. In fact, it is hard to imagine a situation where *Rehaif*'s knowledge-of-status element is clearer from the record.[5]

---

[5] Relevant here is *Rehaif*'s discussion of the difficulty, or lack thereof, in establishing § 922(g)'s knowledge-of-status element. There, the Supreme Court stated, "we doubt that the obligation to prove a defendant's knowledge of his status will be as burdensome as the Government suggests." *Rehaif*, 139 S. Ct. at 2198. In support, the Court cited its decision in *Staples v. United States*, 511 U.S. 600 (1994), which similarly rejected a claim that requiring proof of a defendant's knowledge places a heavy a burden on the (Continued)

48

Accordingly, I am assured that Medley's trial, while imperfect, "resulted in a fair and reliable determination of guilt," *Ramirez-Castillo*, 748 F.3d at 217 (citing *Cedelle*, 89 F.3d at 186), and that neither error otherwise "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Cotton*, 535 U.S. at 632–33. "Indeed, it would be the reversal of a conviction such as this which would have that effect." *Johnson*, 520 U.S. at 470 (citation omitted). Because no "miscarriage of justice" would result if we did not notice these errors, I would not do so.

Lastly, my conclusion aligns with every other circuit—literally, every one—that has addressed these issues. When defendants have claimed essentially identical *Rehaif* indictment and jury-instruction errors, our sister circuits have uniformly held that *Olano*'s third and fourth prongs are not satisfied when their records similarly compelled the conclusion that the defendants knew they were felons at the time of their gun possession. *See, e.g., United States v. Maez*, 960 F.3d 949, 964 (7th Cir. 2020) (affirming felon-in-possession conviction where a defendant stipulated to his felon status and had previously served a total of 23 years in prison); *United States v. Ward*, 957 F.3d 691, 695 (6th Cir. 2020) (affirming felon-in-possession conviction where defendant stipulated to his felon status, had served a total of six years in prison, and was on supervised release at the time of the offense); *United States v. Huntsberry*, 956 F.3d 270, 285–86 (5th Cir. 2020)

---

government. *Id.* at 2195. In doing so, the Court emphasized that "knowledge can be inferred from circumstantial evidence, including any external indications" made by the defendant. *Staples*, 511 U.S. at 615 n. 11.

(affirming felon-in-possession conviction where defendant stipulated to his felon status and had been previously sentenced to two years imprisonment); *United States v. Reed*, 941 F.3d 1018, 1022 (11th Cir. 2019) (affirming felon-in-possession conviction where defendant stipulated to his felon status and had previously served 18 months in prison); *United States v. Hollingshed*, 940 F.3d 410, 416–17 (8th Cir. 2019) (affirming felon-in-possession conviction where defendant stipulated to his felon status and had previously served approximately 63 months in prison); *United States v. Benamor*, 937 F.3d 1182, 1189 (9th Cir. 2019) (affirming felon-in-possession conviction where defendant stipulated to his felon status and had previously served more than nine years in prison). We should do the same.

## III.

The majority reaches a different conclusion. It recognizes both errors after finding that they affected Medley's substantial rights and undermined the fairness and integrity of judicial proceedings. I feel compelled to explain my disagreements with those conclusions and the standards applied to reach them.

## A.

Since there is no dispute that Medley satisfied the first two prongs required for a plain error-review under *Olano*, I begin with the majority's reasons for concluding that both errors affected Medley's substantial rights.

1.

Regarding the indictment error, the majority holds that "[s]ince Medley's indictment failed to satisfy the notice function of an indictment through its charging language and description of overt acts, its defects violated Medley's substantial rights." *Ante* at 18. But in my view, that does not end the inquiry for analyzing whether this error was prejudicial under plain-error review. Supreme Court and Fourth Circuit precedent requires us to examine whether there is "a reasonable probability that, but for the error, the outcome of the [district court] proceeding would have been different." *Molina-Martinez*, 136 S. Ct. at 1343 (internal citation and quotation marks omitted); *see Denton*, 944 F.3d at 185. Focusing singularly on notice, the majority fails to ask this fundamental and required question.

The majority traces much of its approach to our decision in *United States v. Promise*, 255 F.3d 150 (4th Cir. 2001) (en banc). It interprets our fractured *en banc* decision to conclude that "because the indictment failed to allege, and the jury failed to find, [the specific amount of cocaine base attributed to him as an element of the offense], the appellant's substantial rights were violated." *Ante* at 13. In my view, the majority misinterprets *Promise*.

As an initial matter, *Promise* involved different issues from those we face here. There, the defendant argued that his sentence was unlawful under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because his indictment did not allege, and the jury did not find, the threshold drug quantity required to impose the increased penalty he received for his drug-

51

trafficking conviction. *Promise*, 255 F.3d at 152. In contrast, Medley challenges his conviction, not his sentence. And as *Promise* makes clear, this distinction is critical when applying *Olano*'s third prong to indictment errors. There, we stated that in order to determine whether a criminal defendant "can demonstrate that the [indictment] error affected his substantial rights . . . we must first understand the nature of the error, *i.e.*, whether the flaw is in [the defendant's] conviction or in his sentence." *Promise*, 255 F.3d at 160. And unlike here, we concluded that Promise was "properly charged" by the indictment and "the jury was properly instructed regarding the elements of the charged offense." *Id.* As a result, we explained that "the error was not in Promise's conviction," but, instead, "with Promise's sentence." *Id.* The majority ignores this distinction.

Second, the majority misconstrues *Promise*'s holding. There, we did not conclude that the indictment error affected Promise's substantial rights "*because* the indictment failed to allege, and the jury failed to find" the additional drug quantity needed to support his sentence. *Ante* at 13 (emphasis added). Instead, we held that the error affected Promise's substantial rights *because* he demonstrated that it resulted in individual prejudice—namely, his sentence was ten years longer than the maximum sentence he could have lawfully received based on the drug quantity alleged by the indictment and found by the jury. *See Promise*, 255 F.3d at 160. No such individual prejudice is evident from the record here.

The majority next contends that in *United States v. Carrington*, 301 F.3d 204 (4th Cir. 2002), another case where the defendant challenged his sentence under *Apprendi*, we suggested "that a defendant is prejudiced by an incomplete indictment if 'the protections

52

provided by an indictment were . . . compromised.'" *Ante* at 16–17 (quoting *Carrington*, 301 F.3d at 210). Once again, I disagree.

In addition to presenting different circumstances from those we face here, *Carrington* does not purport to establish the third-prong standard articulated by the majority for plain-error review of indictment errors. There, the defendant challenged his sentence based, in part, on the government's failure to allege a drug quantity in his drug-conspiracy charge. *Carrington*, 301 F.3d at 209. And we agreed that the "indictment's failure . . . to include a specific drug amount in the charging language" constituted a plain error. *Id.* at 210. However, we noted that "[u]nlike the indictment considered by the Supreme Court in *Cotton*, in which no drug quantity was alleged anywhere in the indictment, the indictment [there], while not satisfying the requirement of alleging drug quantity in the charging language, still fulfilled the notice purpose of an indictment through its description in the overt acts." *Id.* Therefore, we held the "the protections provided by an indictment were not compromised," and the error "did not affect Carrington's substantial rights." *Id. Carrington* does note that indictments must protect a defendant's rights "(1) to be notified of the charges against him by a description of each element of the offense, and (2) to be provided an accurate record of the charges against him" to prevent a subsequent prosecution for the same offense. Nowhere does it say, however, that the degree to which an indictment protects these two rights determines whether an indictment error prejudiced a defendant under *Olano*'s third prong. *Id.* at 209. The majority appears to have

53

seized on the factual circumstances in *Carrington* to articulate a rule that the decision did not, itself, purport to establish.

Further, reading *Carrington* to establish the rule the majority claims requires us to turn our back on well-established Supreme Court and Fourth Circuit precedent, under which we must look beyond the mere existence of an error to determine if, but for that error, the result of the lower-court proceeding would have likely been different. *See, e.g.*, *Molina-Martinez*, 136 S. Ct. at 1343 (stating that an error affects a defendant's substantial rights if there is "'a reasonable probability that, but for the error,' the outcome of the proceeding would have been different" (quoting *Dominguez Benitez*, 542 U.S. at 76)); *Hastings*, 134 F.3d at 240 (stating that an error affects a defendant's substantial rights if "the error actually affected the outcome of the proceedings," and collecting cases demonstrating a cross-circuit consensus). In my view, even under the majority's reading of *Carrington*, a standard implicitly "suggested" by this Court cannot displace a standard expressly required by the Supreme Court.

What's more, the notice-based prejudice standard that the majority claims these cases established is essentially the same as the standard for determining whether an indictment error exists in the first place. *See, e.g., Russell v. United States*, 369 U.S. 749, 763–64 (1962) (stating that whether the indictment provides adequate notice of the elements of a criminal charge, and enables a defendant to plead a former acquittal or conviction for the same offense, are the two "criteria by which the sufficiency of an indictment is to be measured"). In other words, the majority's standard conflates the first

54

prong of plain-error review (whether there is an error) with the third prong (whether the error affected the defendant's substantial rights). *See Olano*, 507 U.S. at 732. The practical effect of this approach is that it treats any notice-based indictment error as necessarily affecting a defendant's substantial rights—in other words, as a *de facto* structural error. Thus, in my view, the majority departs from the well-established Supreme Court and Fourth Circuit law that declines to treat indictment errors as structural. *See, e.g., Russell*, 369 U.S. at 762 ("Convictions are no longer reversed because of minor and technical [indictment] deficiencies which did not prejudice the accused." (quoting *Smith v. United States*, 360 U.S. 1, 9 (1959))); *Carrington*, 301 F.3d at 209–10 (concluding that an indictment error "did not affect [the defendant's] substantial rights"); *Promise*, 255 F.3d at 160 (stating that a defendant must "demonstrate that the [indictment] error affected his substantial rights, *i.e.*, that it was prejudicial."); *United States v. Cotton*, 261 F.3d 397, 403 (4th Cir. 2001), *rev'd on other grounds*, 535 U.S. 625 (2002) (stating that to show that an indictment error affected their substantial rights, defendants challenging their sentence must "demonstrate" how that error prejudiced them at sentencing).

Our precedent requires a determination that, but for the error, it is reasonably likely that the result would have been different. None of the cases cited by Medley or the majority justify the failure to apply this standard under *Olano*'s third prong.

2.

As with the indictment error, the majority concludes that the error in the jury instructions affected Medley's substantial rights. The majority reaches this conclusion for two reasons.

The majority first concludes that, since we have no way to know how Medley might have defended the knowledge-of-status element, we should consider *Olano*'s third prong satisfied, without even attempting to evaluate whether Medley was prejudiced by the instructional error. Specifically, it reasons that "[b]ecause it is inappropriate to speculate how Medley might have defended the element in the counterfactual scenario where he was presented with the correct charges against him, we find that the instructional error in this case violated his substantial rights." *Ante* at 25.

Despite this conclusion, the majority undertakes a prejudice inquiry as an alternative basis for its third-prong conclusion. In doing so, it finds that the error affected Medley's substantial rights because the government did not meet its burden to show "*beyond a reasonable doubt* that the jury verdict [in Medley's case] would have been the same absent the error." *Ante* at 26 (quoting *Neder*, 527 U.S. at 19) (emphasis original).

But in its analysis of both reasons, the majority applies the standard for harmless-error review of preserved errors instead of the standard for plain-error review of unpreserved errors. More specifically, the majority relies on the Supreme Court's decision in *Neder* and our decision in *United States v. Brown*, 202 F.3d 691 (4th Cir. 2000) in explaining both of its reasons. Those cases, however, involved erroneous jury instructions

56

that were subjected to Rule 52(a) harmless-error—not Rule 52(b) plain-error—review. *See Neder*, 527 U.S. at 17; *Brown*, 202 F. 3d at 699. The difference between these standards is significant. *See Hastings*, 134 F.3d at 240. When courts review constitutional errors under harmless-error review, the government bears the heavy burden to show, "beyond a reasonable doubt," that "the jury verdict would have been the same absent the error." *Neder*, 527 U.S. at 17.[6] In contrast, plain-error review places a lower burden on the defendant to show "a reasonable probability" that, but for the error, the jury verdict would have been different. *Dominguez Benitez*, 542 U.S. at 82. Accordingly, "'harmless error and plain error are not the same, and the fact that an error is not harmless does not necessarily mean it' affected the defendant's substantial rights." *Hastings*, 134 F.3d at 240 (quoting *United States v. McKinney*, 954 F.2d 471, 475 (7th Cir. 1992)).[7]

So, rather than asking whether Medley has met his burden of establishing there was "a reasonable probability that, but for the error, the outcome of the [district court]

---

[6] In contrast, the standard for holding a "nonconstitutional error" harmless is more similar to the analysis for prejudice under a plain-error review. In that situation, "we must be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *United States v. Ibisevic*, 675 F.3d 342, 349 (4th Cir. 2012) (internal quotation marks and citation omitted).

[7] To be sure, we have acknowledged that due to certain similarities between the Rule 52(a) and 52(b) standards, "applying principles of harmless error, proves instructive" when conducting plain-error review. *See United States v. Strickland*, 245 F.3d 368, 379-80 (4th Cir. 2001). But nothing in *Strickland*, nor any other case of which I am aware, permits us to supplant the plain-error prejudice standard with the harmless-error prejudice standard for constitutional errors.

proceeding would have been different," *Molina-Martinez*, 136 S. Ct. at 1343, the majority asks whether, under the harmless-error standard for constitutional errors, the government met its burden. As a result, the majority's third-prong analysis not only applies the wrong standard of proof, it also places the burden on the wrong party. Neither *Neder* nor *Brown* nor any other authority cited by Medley or the majority justify the majority's failure to apply the proper standard in its third-prong analysis.

Further, it is important to recognize the practical effect of the majority's initial conclusion that the instructional error violated Medley's substantial rights "[b]ecause it is inappropriate to speculate how Medley might have defended the element in the counterfactual scenario where he was presented with the correct charges against him . . . ." *Ante* at 25. Under this reasoning, any time a change in law adds an element to an offense of conviction, the absence of that element from prior jury instructions necessarily affects a defendant's substantial rights. Thus, as with its analysis of the indictment error, the majority's initial conclusion effectively transforms the omission of an element from jury instructions as a *de facto* structural error, in conflict with the Supreme Court's holding in *Neder*. *See Neder*, 527 U.S. at 9.

## B.

After concluding that these errors affected Medley's substantial rights, the majority exercised its discretion to notice the errors because they "fall within the category of errors that warrant correction." *Ante* at 29. I disagree with the majority on this issue as well.

First, the majority eloquently emphasizes the protections guaranteed by the Fifth and Sixth Amendments. But in doing so, it largely relies on cases addressing constitutional errors not present in Medley's case. *See ante* at 29–30. As to the constitutional protections actually implicated by the *Rehaif* errors, I agree they are significant. Nevertheless, the mere implication of these protections, without more, does not justify vacating Medley's conviction under plain-error review. *See Ramirez-Castillo*, 748 F.3d at 217 ("[W]e are not obligated to notice even structural errors on plain error review." (quoting *Promise*, 255 F.3d at 161)). Instead, our precedent requires us to look carefully at the whole record to see if failing to notice these errors would result in a "miscarriage of justice." *United States v. Frady*, 456 U.S. 152, 163 n. 14 (1982). And central to this determination is whether the defendant's trial "resulted in a fair and reliable determination of guilt." *Ramirez-Castillo*, 748 F.3d at 217. In my view, the majority's analysis fails to adequately do this.

Second, when the majority considers the evidence of Medley's knowledge that he had been convicted of a crime punishable by more than one year in prison, it concludes that such evidence is overwhelming. However, despite that, it exercises its discretion to notice the *Rehaif* errors because, under the law at the time of Medley's trial, he had no reason to, and thus did not, contest his knowledge of his prohibited status. *Ante* at 31-32. According to the majority, this means the evidence of Medley's knowledge was not uncontroverted and distinguishes Medley's case from *Neder, Johnson* and *Cotton*. *Id.*

To begin, I agree with the majority that the evidence of Medley's guilt was overwhelming. And I also agree that Medley had no obvious reason, at the time of his trial,

59

to defend the knowledge-of-status element. After all, at that time, our precedent did not consider a defendant's knowledge of his prohibited status an essential element under 18 U.S.C. § 922(g). But I disagree that this difference warrants noticing the *Rehaif* errors in the face of overwhelming evidence that Medley knew he was a felon. Neither *Neder, Johnson* nor *Cotton* state that a reviewing court may correct an omitted-element error, in the face of overwhelming evidence of the omitted element, if a defendant had no reason to contest the omitted element at trial. In fact, they do not appear to consider whether the defendant had an "obvious reason" to contest the omitted element at all. Instead, they focus on the whether the evidence of guilt in the record was overwhelming and essentially uncontroverted. *See Cotton*, 535 U.S. at 633 ("The evidence that the conspiracy involved at least 50 grams of cocaine base was 'overwhelming' and 'essentially uncontroverted'").[8]

---

[8] Relatedly, the Supreme Court has repeatedly concluded that purely procedural errors—ones that likely did not affect the substantive outcome—do not satisfy the fourth prong of plain-error review. In *Johnson*, for example, the district court failed to submit a materiality element to the jury, but the Supreme Court found that the fourth prong of plain-error review was not satisfied because "the evidence supporting materiality was 'overwhelming.'" *Johnson,* 520 U.S. at 470. Reversal based on errors that have no actual "effect on the judgment," the Court explained, "encourages litigants to abuse the judicial process and bestirs the public to ridicule it." *Id.* (quoting R. Traynor, The Riddle of Harmless Error 50 (1970) (internal quotation marks omitted)). And in *Marcus*, the Second Circuit had held that an *ex post facto* error automatically satisfies the plain-error standard, "no matter how unlikely" it was that the jury actually convicted the defendant based on conduct that predated the statute of conviction. *Marcus,* 560 U.S. at 261 (emphasis deleted) (internal quotation marks omitted). In reversing that decision, the Supreme Court emphasized that, "in most circumstances, an error that does not affect the jury's verdict does not significantly impugn the 'fairness,' 'integrity,' or 'public reputation' of the judicial process." *Id.*at 265–66.

Unfortunately, the majority abandons this approach in favor of a standard that neither the Supreme Court, nor any of our sister circuits, have adopted. And the practical effect of the majority's standard is dramatic. It, in effect, neuters *Olano*'s fourth prong in cases involving an omitted-element error due to a subsequent change in law, because, in such cases, defendants will rarely have an "obvious reason" to challenge the omitted element at trial. Moreover, it allows decisions, like the one we announce today, to "seriously affect[] the fairness, integrity or public reputation of judicial proceedings" by vacating a conviction "because of an error that was never objected to at trial," despite "overwhelming and uncontroverted evidence" of the defendant's guilt. *Cotton*, 535 U.S. at 634 (citing *Johnson*, 540 U.S. at 470).

Finally, I disagree with the majority's attempt to paint the trial-court proceedings as a confluence of errors, where "too much went wrong" for us not to recognize the *Rehaif* errors and vacate Medley's conviction. *Ante* at 33 (quoting *United States v. Lockhart*, 947 F.3d 187, 199 (4th Cir. 2020) (Wilkinson, J., concurring)). Neither the indictment nor the jury instructions included the knowledge-of-status element. These errors stemmed from the same defect, caused by a post-conviction change in law, that affected two aspects of Medley's trial. But the majority's fourth-prong analysis also points to the fact that Medley was acquitted of other charges. Acquittals of separate charges hardly constitute an irregularity, much less an error. Accordingly, this is not a case like *Lockhart*, where, in addition to a *Rehaif* error, the district-court proceedings were infected by a separate,

61

additional error—the district court's failure to advise the defendant of the mandatory minimum sentence he faced during his plea colloquy.

In sum, our precedent requires us to examine the record to determine if, despite the errors under review, Medley's trial "resulted in a fair and reliable determination of guilt," *Ramirez-Castillo*, 748 F.3d at 217 (citing *Cedelle*, 89 F.3d at 186), and did not otherwise "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Cotton*, 535 U.S. at 632–33. For the reasons set forth above, the overwhelming and uncontroverted evidence that Medley knew he had been convicted of a crime punishable by more than one year in prison, despite the omitted element, assures us that his conviction need not be vacated.

IV.

Since I would reject Medley's *Rehaif* claims, I must now consider his other challenges to his conviction and sentence.

A.

I begin with Medley's claim that the district court violated his Sixth Amendment right to counsel by admitting the uncounseled statements he made to Maryland police after he was appointed counsel in his D.C. case. We review the factual findings underlying the district court's motion to suppress for clear error and its legal conclusions de novo. *United States v. Lentz*, 524 F.3d 501, 520 (4th Cir. 2008).

Medley acknowledges that he was not federally charged at the time of the interview, but argues that the federal felon-in-possession charge constitutes the "same offense" as the D.C. felon-in-possession charge for Sixth Amendment purposes. Therefore, he claims that his Sixth Amendment right to counsel attached prior to his federal indictment.[9] Medley also argues that the government did not show that he knowingly and voluntarily waived his right to counsel when he answered Detective Dalton's questions. Instead, he claims that Dalton led him to believe that he was speaking "*only* about a separate investigation in Maryland—*not* his D.C. case." Appellant's Opening Brief at 34 (emphasis original). As a result, Medley argues that the admission of his statements at trial violated the Sixth Amendment.

1.

I must first consider whether Medley's Sixth Amendment right to counsel attached to his federal felon-in-possession charge at the time of the interview. The Sixth Amendment right to counsel guarantees a criminal defendant "the right to have counsel present at all 'critical' stages of the criminal proceedings," including interrogation by the government. *Montejo*, 556 U.S. at 786. This right, however, does not attach until adversarial judicial proceedings commence "by way of formal charge, preliminary hearing,

---

[9] Although Medley argues that his D.C. and federal felon-in-possession charges are the "same offense" under double jeopardy analysis, he never claims that charging him for the same conduct under the D.C. and U.S. criminal codes constitutes punishing him twice for the same offense under the Fifth Amendment's Double Jeopardy Clause. He only argues that the two offenses are "the 'same' for Sixth Amendment right-to-counsel purposes." Appellant's Opening Brief at 48.

indictment, information, or arraignment." *Texas v. Cobb*, 532 U.S. 162, 167–68 (2001) (quoting *McNeal v. Wisconsin*, 501 U.S. 171, 175 (1991)). Because this right is "offense specific," it can only be invoked regarding offenses for which the defendant has been formally charged. *Cobb*, 532 U.S. at 168 (citing *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991)); *United States. v. Holness*, 706 F.3d 579, 589 (4th Cir. 2013). There is no exception that allows the right to be invoked for uncharged offenses that are merely "factually related" to a charged offense. *Cobb*, 532 U.S. at 168.

However, "when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Cobb*, 532 U.S. at 173. Because this rule stems from Double Jeopardy concerns, "the dual sovereignty doctrine [also] applies for the purposes of defining what constitutes the same offense for right-to-counsel purposes." *Holness*, 706 F.3d at 591. Therefore, for the "same offense" exception to apply, the charged and uncharged offenses must be prosecuted by the same sovereign and the *Blockburger* test must be met.

As noted above, Medley concedes that he was not federally charged at the time of his interview. However, he argues that the right to counsel nevertheless attached to his federal felon-in-possession charge because it is the same offense as the D.C. felon-in-possession charge. In evaluating this claim, I evaluate whether the District of Columbia and federal government are the same sovereign before turning to whether the D.C. and federal felon-in-possession statutes satisfy the *Blockburger* test.

a.

To determine whether the District of Columbia and the federal government are the same sovereign, we ask "whether the prosecutorial powers of the two jurisdictions have independent origins" or "whether those powers derive from the same ultimate source." *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1867 (2016). The Supreme Court has held that the District of Columbia's prosecutorial power "derived from, rather than preexisted association with, the Federal Government." *Id.* at 1875. The Constitution grants "unqualified power" to Congress "[t]o exercise exclusive Legislation in all Cases whatsoever, over" the District of Columbia. Art. I., § 8, cl. 17; *see also Ortiz v. United States*, 138 S. Ct. 2165, 2177 (2018). This "plenary" power charges Congress with "exercis[ing] all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes." *Palmore v. United States*, 411 U.S. 389, 397 (1973); *see also Ortiz*, 138 S. Ct. at 2177. Over the years, Congress used its Clause 17 authority to enact laws that compose much of the District of Columbia Code and to create the D.C. Superior Court and Court of Appeals. *Palmore*, 411 U.S. at 398. In 1973, Congress used this authority to create D.C.'s current "home rule" system of government by delegating certain executive and legislative powers to a mayor and council elected by D.C. residents. *Banner v. United States*, 428 F.3d 303, 305 (D.C. Cir. 2005) (citing District of Columbia Self-Government and Governmental Reorganization ("Home Rule") Act, Pub. L. No. 93–198, 87 Stat. 774 (1973)). Although the Home Rule Act gives D.C. a level of autonomy over its criminal laws and local affairs,

we treat the District of Columbia and the Federal government as the same sovereign for double-jeopardy purposes because D.C. did not "possess[ ] such control as an original matter," but "deriv[ed] it from the Federal Government." *Sanchez Valle*, 136 S. Ct. at 1874–75; *see also United States v. Weathers*, 186 F.3d 948, 951, n.3 (D.C. Cir. 1999). "Although the Double Jeopardy Clause does not bar multiple punishments under federal and state law, a defendant may not be punished twice for the same offense under both the United States Criminal Code and the District of Columbia Criminal Code because both were adopted by Congress." *Id.* at 951 n.3.

The government's opposition to this conclusion appears based primarily on the fact that the interview was carried out by Maryland law enforcement as opposed to D.C. law enforcement. But as set forth, this argument ignores the applicable test for separate sovereigns under Supreme Court precedent. Following that precedent, the District of Columbia and the federal government derive their power from the same ultimate source and, thus, are not separate sovereigns.

b.

Having determined the District of Columbia and the federal government are the same sovereign, I next consider whether Medley's federal felon-in-possession charge is the "same offense" as his D.C. felon-in-possession charge under the *Blockburger* test. In *Blockburger*, the Supreme Court explained that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether *each* provision requires

66

proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (emphasis added). When applying the *Blockburger* test, "our exclusive focus is upon the elements of the statutory provisions in question, not the particular facts of the underlying case." *United States v. Ayala*, 601 F.3d 256, 265 (4th Cir. 2010) (internal quotation marks and citations omitted); *see also Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975) ("As *Blockburger* and other decisions applying its principle reveal, the Court's application of the test focuses on the statutory elements of the offense."); *United States v. Martin*, 523 F.3d 281, 290 (4th Cir. 2008) (stating that in Double Jeopardy analysis, "[a]s in any case requiring us to sort out congressional intent, we begin with the statutory text itself."). If each statute "requires proof of a distinct element, then multiple punishments are presumed to be authorized absent a clear showing of contrary Congressional intent." *Ayala*, 601 F.3d at 265 (internal quotation marks and citations omitted).

With this guidance in mind, I turn to the text of the applicable statutes. At the time of Medley's guilty plea, D.C.'s unlawful possession of a firearm statute stated, in pertinent part:

> (a) No person shall own or keep a firearm, or have a firearm in his or her possession or under his or her control, within the District of Columbia, if the person:
>> (1) Has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . .

D.C. Code § 22-4503(a)(1). Meanwhile, the federal felon-in-possession statute provided:

> (g) It shall be unlawful for any person—

(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

[. . .]

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

The statutes' substantive elements are essentially the same. Both require proof that the defendant possessed a firearm and has a prior felony conviction. However, the statutes have different jurisdictional elements. The federal statute requires proof that the firearm affected or traveled in interstate commerce, whereas the D.C. statute requires that the unlawful possession be "within the District of Columbia." D.C. Code § 22-4503(a)(1).

Our question, then, is whether to consider statutes' jurisdictional elements under the *Blockburger* double-jeopardy test. While two of our sister circuits are split on this issue,[10] our precedent calls us to consider differences in jurisdictional elements when conducting *Blockburger* analysis. We addressed this issue in *United States v. Jones*, 797 F.2d 184,

---

[10] The Fifth Circuit has held that jurisdictional elements should not be considered during *Blockburger* analysis because "[i]n *Blockburger* itself, the two facts to be proven constituted two evils that Congress sought to combat. . . . A jurisdictional fact, while a prerequisite to prosecution under a particular statute, is not in itself an evil that Congress can seek to combat." *United States v. Gibson*, 820 F.2d 692, 698 (5th Cir. 1987). However, the Fifth Circuit has since expressed "some concern with the reasoning of *Gibson*" while continuing to follow it as binding precedent. *United States v. Agofsky*, 458 F.3d 369, 372 (5th Cir. 2006). In contrast, the Ninth Circuit has held that jurisdictional elements should be considered because they may "reflect a legislative intent to combat a separate evil." *United States v. Hairston*, 64 F.3d 491, 496 (9th Cir. 1995).

186–87 (4th Cir. 1986) and *McGann v. United States*, 261 F.2d 956, 958–59 (4th Cir. 1958), both of which, like our facts, involved two offenses prosecuted by the same sovereign, whose statutory elements each required proof of different jurisdictional elements. In *Jones*, the defendants were convicted of receiving stolen property "within the special maritime and territorial jurisdiction of United States," in violation of 18 U.S.C. § 662, and receiving stolen property "after it moved in interstate commerce," in violation of 18 U.S.C. § 2315. *Jones*, 797 F.2d at 185. On appeal, the defendants argued that the two counts were multiplicitous, and that one count should be dismissed, or the conviction vacated, because they were punished twice for the same offense. *Id.* at 186. We affirmed the conviction, holding:

> Count 1 requires proof that the acts were done within the special maritime and territorial jurisdiction of the United States. This is not a requirement under Count 2. However, Count 2 does require proof that the tickets were received after they moved in interstate commerce and that they were a part of interstate commerce when received. The proof of these additional facts satisfies the *Blockburger* test.

*Id.* at 186–87. We found that these distinct jurisdictional elements demonstrated that "[t]he congressional purpose . . . [was] to prevent the receipt of stolen property on federal land and water by enacting § 662, while it sought to protect interstate commerce through § 2315." *Id.* at 137.

In *McGann*, the defendant was convicted of robbery "of a national bank" under 18 U.S.C. § 2113, and of robbery "on lands within the territorial jurisdiction of the United States"—Andrews Air Force Base in Maryland—under 18 U.S.C. § 2111. *McGann*, 261 F.2d at 957. The former statute defined "bank" as "a member bank of the Federal Reserve

69

System, organized and operating under the laws of the United States, the deposits of which are insured by the F.D.I.C." *Id.* at 959. Citing *Blockburger*, we held that, although the two convictions arose from the same act, they did not charge McGann with the same offense because their distinct jurisdictional elements "require[d] proof of a fact not essential to the other." *Id.* at 958–59. Specifically, we found, "The essential element for conviction under the former charge, but not the latter, was robbery of a 'bank' as defined by the statute . . . Such proof was not necessary to sustain the latter indictment, the requisite proof there being the robbery occurred on a federal reservation . . . ." *Id.* at 559.

Likewise, *Holness*, although ultimately decided based on the fact that the Maryland and federal crimes were prosecuted by separate sovereigns—the state of Maryland and the federal government—is consistent with *Jones* and *McGann*. There, we also noted that the two offenses "failed the *Blockburger* test" partially because "interstate travel must be shown in connection with the federal offense, but no such condition adheres to the state offense." *Holness*, 706 F.3d at 590–91.[11]

---

[11] While the Supreme Court has not directly addressed whether jurisdictional elements should be considered during *Blockburger* double-jeopardy analysis, it recently held in *Torres v. Lynch*, 136 S. Ct. 1619, 1624, (2016) that while substantive and jurisdictional elements "are not created equal for every purpose . . . both kinds of elements must be proved to a jury beyond a reasonable doubt . . . ." *Torres*, 135 S. Ct. at 1624. To be sure, *Torres* involved different circumstances than those presented here. But because jurisdictional elements must be proven beyond a reasonable doubt, and the focus of the *Blockburger* double-jeopardy test is "whether each provision requires proof of a fact which the other does not," *Blockburger*, 284 U.S. at 304, we believe that Supreme Court precedent supports our consideration of statutes' jurisdictional elements during *Blockburger* analysis.

Applying that precedent here, since the federal felon-in-possession statute and the D.C. felon-in-possession statute have different jurisdictional elements, they do not charge Medley with the same offense under *Blockburger*. As a result, when Medley was interviewed by Detective Dalton, his Sixth Amendment right to counsel had only attached to his D.C. charge and not to his subsequent federal charge. The district court therefore did not err in admitting the uncounseled statements that Medley made to Maryland police after he was appointed counsel in his D.C. case.

2.

However, even if Medley's Sixth Amendment right to counsel had attached to his federal felon-in-possession charge on the day that he was questioned by Detective Dalton, Medley waived the right because he never made a clear, unambiguous assertion of the right to counsel after receiving his *Miranda* warnings.

A defendant who wishes to invoke his Sixth Amendment right to counsel must affirmatively do so. *Montejo*, 556 U.S. at 797. Accordingly, the government is permitted to initiate contact with a represented criminal defendant, subject only to the requirement that the questioning stop if a defendant adequately asserts this right. *Id.* at 789. While "a defendant who does not want to speak to police without counsel present need only say as much when he is first approached and given *Miranda* warnings," *Id*. at 794–95, the request for counsel must be clear and unambiguous. *See, e.g., Montejo*, 556 U.S. at 797 (holding that a suspect is required to make "a clear assertion of the right to counsel."); *Davis v. United States*, 512 U.S. 452, 459 (1994) (holding "the suspect must unambiguously request

71

counsel."). This standard is met if a defendant "articulate[s] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459 (internal citation omitted).

A defendant's failure to invoke his Sixth Amendment right to counsel may constitute a waiver of that right. However, such a waiver is only permitted if it is "voluntary, knowing, and intelligent." *Montejo*, 556 U.S. at 786; *see also Patterson v. Illinois*, 487 U.S. 285, 291–292 (1988). To determine if a Sixth Amendment waiver is knowing and voluntary, courts look to whether the defendant received his *Miranda* warnings and if he subsequently agreed to waive those rights. *See Montejo*, 556 U.S. at 798–99. An accused who has properly received his *Miranda* warnings "has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Patterson*, 487 U.S. at 296; *see also Montejo*, 556 U.S. at 786 ("[W]hen a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick . . ."). Because "the decision to waive need not itself be counseled . . . [t]he defendant may waive the right whether or not he is already represented by counsel . . . ." *Montejo*, 556 U.S. at 786.

Turning to the facts here, Medley never made a clear, unambiguous assertion of his right to counsel after receiving his *Miranda* warnings. He did not request his attorney, ask

72

for the interview to stop or say anything that "a reasonable police officer in the circumstances would understand . . . to be a request for an attorney." *Davis*, 512 U.S. at 459 (internal citation omitted). Instead, Medley knowingly and intelligently waived his right to counsel by voluntarily answering Dalton's questions after being properly informed of his *Miranda* rights. *See Patterson*, 487 U.S. at 296.

That, however, does not end our waiver inquiry. A defendant who waives his Sixth Amendment right to counsel may still challenge his waiver by establishing it was based on misrepresentation or deception by the State. *See Montejo*, 556 U.S. at 798. Medley argues Detective Dalton misled him by stating that he was not interested in Medley's D.C. case. He claims that, because of Dalton's statement, Medley did not understand that by answering Dalton's questions, he was waiving his right to counsel regarding his D.C. felon-in-possession charge. Appellant's Opening Brief at 38. As a result, Medley claims that he "did not knowingly and intelligently waive his Sixth Amendment right to counsel *in his D.C. case*." *Id*. at 29 (emphasis original). However, this is an appeal from Medley's *federal* case and only concerns whether he waived his right to counsel regarding his *federal* charges. The use of Medley's statements in his D.C. case is not at issue here.

What is at issue is whether Dalton's representations prevented Medley from making a knowing or voluntary waiver of his Fifth or Sixth Amendment rights regarding his subsequent federal charges. Medley does not even make this claim and, even if he had, we see no support for it in this record. At the beginning of the interview, Dalton told Medley that he was not interested in Medley's D.C. case. Dalton testified that at the time of the

73

interview, the only charges he was investigating in relation to the Maryland carjacking were "attempted murder, shooting and armed carjacking." J.A. 345. Medley points to nothing in the record suggesting this statement was not true.

Further, the subsequent federal indictment of Medley for both the carjacking and felon in possession charges does not establish that Dalton's representations to Medley were false. Dalton was responsible for conducting a *state* carjacking investigation. The subsequent *federal* decision to use Medley's statements to add a felon-in-possession charge does not show that Dalton tricked Medley into waiving his Sixth Amendment right to counsel. Accordingly, even if Medley's Sixth Amendment right to counsel attached to his federal felon-in-possession charge at the time of the interview, which it had not, Medley waived that right by answering Dalton's questions after being informed of his *Miranda* rights.

## B.

I now turn to Medley's claim that the district court erred by enhancing his sentence after finding—based on a preponderance of the evidence—that he used the Rock Island Firearm in connection with the carjacking of Elton Wright. This argument has two components. First, Medley claims that the four-level sentencing enhancement described earlier violated his Sixth Amendment right to a jury trial because it was based on acquitted conduct. Second, he argues that the district court's application of the Guidelines enhancement constituted clear error because there was insufficient evidence to find that he committed the Maryland carjacking. I address each issue in turn.

74

1.

Medley first argues that the sentencing enhancement violated his Sixth Amendment right to a jury trial because it was based on acquitted conduct. Whether a sentencing court may consider acquitted conduct in calculating of the relevant Guidelines range is a question of law that this Court reviews de novo. *See United States v. Walker*, 922 F.3d 239, 253 (4th Cir. 2019).

"Sentencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as that Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict" *United States v. Grubbs*, 585 F.3d 793, 799 (4th Cir. 2009) (quoting *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir.2008)); *see also United States v. Slager*, 912 F.3d 224, 233 (4th Cir. 2019) ("When sentencing courts engage in fact finding, preponderance of the evidence is the appropriate standard of proof.") (internal citation omitted). Relevant here, this includes conduct for which a defendant has been acquitted. "[C]lear Supreme Court and Fourth Circuit precedent hold that a sentencing court may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence." *Grubbs*, 585 F.3d at 798–99. In *United States v. Watts*, 519 U.S. 148, 157 (1997), the Supreme Court clearly stated that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proven by a preponderance of the evidence." Likewise, in *United States v. Jones*, 31 F.3d 1304, 1316 (4th Cir.1994), this Court held that a "defendant need

not be convicted of the charges constituting relevant conduct for him still to be held accountable for them" at sentencing if the government "establish[es] the existence of these other incidents by a preponderance of the evidence."

Following those cases, if the Guidelines are treated as advisory, and the sentence does not exceed the statutory maximum, a court's consideration of acquitted conduct "'does not violate the Sixth Amendment' . . . because 'as far as the law is concerned, the judge could disregard the Guidelines and apply the same sentence . . . in the absence of the special facts.'" *Grubbs*, 585 F.3d at 799 (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465–66 (2007)). As a result, while a "[a] defendant can challenge the district court's factual findings as well as the extent of the district court's reliance on those findings as part of his appeal . . . the court's decision to make factual findings regarding uncharged [or acquitted] conduct does not violate the Sixth Amendment's jury trial guarantee." *Grubbs*, 585 F.3d at 799.

To his credit, Medley concedes that his Sixth Amendment challenge to the use of acquitted conduct as the basis for his Guidelines sentence enhancement is foreclosed by Supreme Court and Fourth Circuit precedent. However, consistent with a growing number of critics of this practice,[12] he explains his objections to it. Whether or not I agree or

---

[12] *Jones v. United States*, 135 S. Ct. 8, 9 (2014) (Scalia, J., joined by Thomas and Ginsburg, JJ., dissenting from denial of certiorari) (sentencing enhancements based on acquitted conduct "disregard[ ] the Sixth Amendment"); *Watts*, 519 U.S. at 170 (Kennedy, J., dissenting) (allowing district judges "to increase a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal."); *United States v. Martinez*, 769 Fed. App'x. 12 (2d Cir. 2019) (Continued)

disagree with the precedent from the Supreme Court and this Court, I am bound to follow it. Accordingly, the district court's use of acquitted conduct as the basis for a Guidelines sentencing enhancement did not violate Medley's Sixth Amendment right to a jury trial.

2.

Medley also argues that the district court's application of this sentencing enhancement, based on its finding that Medley used the Rock Island Firearm to carjack Elton Wright, constituted clear error. Instead, he claims that "substantial evidence" demonstrates that someone else committed the carjacking. Appellant's Opening Brief at 57.

---

(Pooler, J., concurring) (stating that the district court's practice of using acquitted conduct to enhance a defendant's sentence is "deeply unfair" and runs afoul of the Sixth Amendment); *United States v. Bell*, 808 F.3d 926, 927 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing en banc) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."); *id.* at 930 (Millett, J., concurring in denial of rehearing en banc) ("[A]llowing judges to materially increase the length of imprisonment based on facts that were *submitted directly to and rejected by* the jury in the same criminal case is too deep of an incursion into the jury's constitutional role.") (emphasis original); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (stating that whether the Constitution allows a district court to either decrease or increase a defendant's sentence based on facts found "without the aid of a jury or the defendant's consent" is "far from certain"); *United States v. Canania*, 532 F.3d 764, 776 (8th Cir. 2008) (Bright, J., concurring) ("[T]he consideration of 'acquitted conduct' to enhance a defendant's sentence is unconstitutional."); *United States v. Faust*, 456 F.3d 1342, 1350 (11th Cir. 2006) (Barkett, J., concurring specially) ("[S]entence enhancements based on acquitted conduct are unconstitutional under the Sixth Amendment, as well as the Due Process Clause of the Fifth Amendment.").

77

When evaluating a sentencing court's calculation of the advisory Guidelines range, we review "the district court's factual findings for clear error . . . ." *United States v. Walker*, 922 F.3d 239, 253 (4th Cir. 2019) (citation omitted). We "will not reverse a lower court's findings of fact simply because we would have decided the case differently." *Id.* (citations omitted). Instead, clear error occurs when the lower court's "factual findings are against the clear weight of the evidence considered as a whole." *United States v. Span*, 789 F.3d 320, 325 (4th Cir. 2015).

With that standard in mind, I turn to the district court's decision. In support of its finding that Medley used the Rock Island Firearm in the carjacking of Wright, the district court pointed to the testimony of several eyewitnesses at the scene who identified Medley as the carjacker. It also relied on the testimony of Scott McVeigh from the Prince George's County Police Department's firearms examination unit. Without objection from Medley, the district court qualified McVeigh as an expert in firearm toolmark analysis. McVeigh testified that guns leave certain markings on bullets that they fire. Forensic firearm examiners attempt to match bullets or shell casings from a crime scene to a particular gun by comparing the marks on the recovered evidence—known as "toolmarks"—with marks on those test-fired from the gun in question. McVeigh testified about his evaluation and report that the shell casings found at the scene of the carjacking were fired from the Rock Island Firearm. The district court also pointed to the testimony of Richard Fennern, an agent with the Federal Bureau of Investigation's Cellular Analysis Survey Team, regarding the historical cell-site data of Medley's cellphone. Without objection, the district court

qualified Agent Fennern as an expert in historical cell-site data. When Agent Fennern performed historical cell-site analysis on a phone number linked to Medley, he determined that on December 31, 2016, at about thirty minutes before the carjacking, Medley's phone placed a call in the cell-tower sector covering the apartment complex where the carjacking took place.

Medley argues this evidence is insufficient to support the district court's finding. Medley first criticizes the testimony from eyewitnesses who identified him at the scene. He emphasizes that Elton Wright—the carjacking victim—could not identify his assailant due to the mask that he was wearing. Wright described the assailant as a heavier black male who was a little over six-feet tall, a contrast from Medley's shorter, leaner frame. Wright also testified he had known Medley for about three years and saw him two to three times a week and thus it would be "easy" for him to recognize Medley's voice. J.A. 1823. However, Wright did not recognize the voice, appearance or walk of the man who shot him. And Medley also argues that Wright and the other eyewitnesses offered physical descriptions of the assailant that did not clearly implicate Medley and were, at times, inconsistent.

Medley also attacks McVeigh's testimony. Appellant's Opening Brief at 62. Medley criticized the subjective nature of McVeigh's testimony, as well as his concession that there were some inconsistencies between the shell markings and markings that would come from the equipment at the Rock Island factory and the fact Medley's testimony amounted only

79

to an opinion that the markings on the shell were consistent with a .45 caliber gun and not the specific Rock Island Firearm.[13]

Finally, Medley argues Fennern's testimony was insufficient to support the district court's finding that he was the carjacker. He pointed to Fennern's concession that cell-tower data can be used to determine the "general location" of a cellphone at the time of a specific call, J.A. 2046, and that he could not determine the exact location of a phone based on the nearest cell towers. Therefore, Medley argues that the fact that his phone was in the same "general location" of Wright's apartment on the morning of the carjacking has "minimal probative value." Appellant's Opening Brief at 63.

Medley's arguments have some appeal. However, on this issue, we do not work from a clean slate. We are bound to affirm the district court's factual findings unless they "are against the clear weight of the evidence considered as a whole." *Span*, 789 F.3d at 325. Clear error review requires deference to the trial court's findings even if we may view certain issues differently. *Walker*, 922 F.3d at 253. Under that high standard, I cannot say that the district court erred by enhancing Medley's sentence when it found, based on a preponderance of the evidence, that he used the Rock Island Firearm in connection with the carjacking of Elton Wright.

---

[13] Medley's arguments about McVeigh's testimony go primarily to its reliability. But he did not make a *Daubert* motion. Since no such motion was made, we will not address McVeigh's qualifications or the reliability of his testimony.

## V.

In conclusion, in my view, the *Rehaif* errors did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. Further, the district court did not violate Medley's Sixth Amendment right to counsel by admitting the uncounseled statements that he made to Maryland police after he was appointed counsel in his D.C. case. Next, Medley's Sixth Amendment challenge to the use of acquitted conduct as the basis for his Guidelines sentence enhancement is foreclosed by Supreme Court and Fourth Circuit precedent. Finally, the district court did not err by enhancing Medley's sentence when it found, based on a preponderance of the evidence, that he used the Rock Island Firearm in connection with the carjacking of Elton Wright. For those reasons, I would affirm.